UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

19 80633
CV-Rosenberg

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

NATURAL DIAMONDS INVESTMENT CO.,
EAGLE FINANCIAL DIAMOND GROUP INC
  A/K/A DIAMANTE ATELIER,
ARGYLE COIN, LLC,
JOSE ANGEL AMAN,
HAROLD SEIGEL, AND
JONATHAN H. SEIGEL,



FILED BY       D.C.

MAY 13 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Defendants, and

H.S. MANAGEMENT GROUP LLC,
GOLD 7 OF MIAMI, LLC,
WINNERS CHURCH INTERNATIONAL INC.
  OF WEST PALM BEACH, FLORIDA,
FREDERICK D. SHIPMAN, AND
WHITNEY SHIPMAN,

Mag Reinhart

Relief Defendants.

_____/

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## I. INTRODUCTION

1.    The Commission brings this action to enjoin Natural Diamonds Investment Co.

("Natural Diamonds"), Eagle Financial Diamond Group Inc, a/k/a Diamante Atelier ("Eagle"), and

Argyle Coin, LLC ("Argyle Coin") (collectively, the "Corporate Defendants"), and their owners

Jose Angel Aman ("Aman"), Harold Seigel ("H. Seigel"), and Jonathan H. Seigel ("J. Seigel")

from continuing to defraud investors through the sale of securities in violation of the anti-fraud and registration provisions of the federal securities laws.

2.      From no later than May 2014, the Defendants have raised about $30 million from approximately 300 investors through the sale of securities in the form of promissory notes and investment contracts in Argyle Coin, Natural Diamond, and Eagle.

3.      To lure investors, the Defendants have knowingly or recklessly materially misrepresented how they would use investor funds and the safety of the investments.

4.      Collectively, the Defendants have misused or misappropriated more than $10 million of the $30 million raised from investors in a manner contrary to the representations to investors.

5.      From no later than May 2014 through at least December 2018, Natural Diamonds, Aman, and the Siegels engaged in the unregistered offering of securities in the form of investment contracts in Natural Diamonds.  They told prospective investors that Natural Diamonds would use investor funds to acquire raw colored diamonds known as "fancy colored diamonds," which they would then cut, polish, and resell for profits that would result in investment returns of 24% and the full return of investors' principal within two years.

6.      In reality, Natural Diamonds was a Ponzi scheme.  Aman and Natural Diamonds used investor funds to pay prior investors their purported returns.

7.      When the well began to run dry in early 2015, Eagle, Aman, and the Siegels commenced a second unregistered offering, this time in the form of investment contracts in Eagle. They made the same false representations about the use of investors' funds, and fueled the Ponzi scheme by using Eagle investors' funds to pay Natural Diamonds and Eagle investors their purported investment returns.

2

8.      In addition to operating a multi-layer Ponzi scheme, Aman, Natural Diamonds, and Eagle used investors' funds to purchase horses and riding lessons for Aman's adult son, pay Aman's church and pastors more than $1.5 million, pay H. Seigel and his company more than $3 million, and pay more than $3 million to Aman directly or for his other personal expenditures, including shopping at Gucci and paying the rent on his home.

9.      By late 2017, the Natural Diamonds and Eagle bank accounts lacked funds to continue the Ponzi scheme.  In October 2017, Aman created Argyle Coin and the fraud continued through a third unregistered offering.

10.      The Argyle Coin offering continues to this day.  Aman and Argyle Coin represent that Argyle Coin is offering the first investment in cryptocurrency backed by fancy colored diamonds.  To lure investors, they tell investors they will use investor funds to develop Argyle Coin's cryptocurrency business and the investment is risk-free because investors' principal is protected by valuable diamonds.

11.      This is false.  In truth, Aman has been using Argyle Coin investor funds to continue the Ponzi scheme by using Argyle Coin investor funds to pay Natural Diamonds and Eagle investors their purported investment returns.  As for the valuable diamonds that purportedly protect investors' money, Argyle Coin has none.

12.      Nonetheless, Aman has doubled down on his representations about the safety of the Argyle Coin investment by telling investors that the investment is 100% guaranteed by an insurance bond.  However, under the terms of the bond, investor funds are guaranteed only if Argyle Coin develops a cryptocurrency.  Aman has instead used investor funds primarily to fuel his three-tiered Ponzi scheme with Natural Diamonds and Eagle.

13.     The Natural Diamonds, Eagle, and Argyle Coin bank accounts received more than $30 million from investors.  As of March 31, 2019, these accounts had a combined negative balance of about $120,000.

14.     As for the diamonds, Aman pawned dozens of them and pocketed the proceeds, which totaled more than $750,000.

15.     Through their conduct, Aman, Argyle Coin, Natural Diamonds, and Eagle have violated the anti-fraud provisions of the federal securities laws, and all of the Defendants have violated the registration provisions of the federal securities laws.

16.     Based on the ongoing nature of Aman and Argyle Coin's violations and the scienter Aman has demonstrated through his willful and wanton disregard for the federal securities laws, together with the egregious nature of Natural Diamonds, Eagle, and the Seigels violations, the Defendants have shown they will continue to violate the law unless the Court grants the injunctive and other relief the Commission seeks.

## II.  DEFENDANTS AND RELIEF DEFENDANTS

### A.  Defendants

17.     Natural Diamonds is an active Florida corporation that incorporated in August 2013, with a principal place of business in Palm Beach, Florida.  Natural Diamonds is purportedly in the business of buying and selling diamonds.  Aman owns 45%, H. Seigel owns 45%, and J. Seigel owns 10% of Natural Diamonds.  Aman is its President, H. Seigel is its Vice President, and J. Seigel is its Secretary.  As of March 28, 2019, Natural Diamonds is under the control of a Court-appointed monitor in the case *Round v. NDIC*, 18-cv-81151 (S.D. Fla.)(J. Middlebrooks).  Neither Natural Diamonds nor its securities have ever been registered with the Commission.

18.     Eagle is an active Florida corporation that Aman incorporated in April 2011 with a principal place of business in Palm Beach, Florida.  Eagle is purportedly in the business of buying and selling diamonds for investment purposes.  Eagle also markets itself using the name Diamante Atelier.  According to Aman, Aman owns 45%, H. Seigel owns 45%, and J. Seigel owns 10% of Eagle.  According to the Seigels, Aman owns 100% of Eagle, H. Seigel gets 45% of Eagle's proceeds, and J. Seigel gets 10% of Eagle's proceeds.  As of March 28, 2019, Eagle is under the control of a Court-appointed monitor in the case *Round v. NDIC*, 18-cv-81151 (S.D. Fla.)(J. Middlebrooks), which is the same monitor who has been appointed over Natural Diamonds.  H. Seigel is Eagle's President and Aman is Eagle's Vice President.  Neither Eagle nor its securities have ever been registered with the Commission.

19.     Argyle Coin is an active Florida limited liability company Aman formed in October 2017, with a principal place of business in Palm Beach, Florida.  Aman is Argyle's President and sole officer.  Neither Argyle Coin nor its securities have ever been registered with the Commission.

20.     Aman was a resident of Wellington, Florida from no later than November 2010 until about August 2018 and now resides in Miami, Florida.  He is President of Natural Diamonds, Vice President of Eagle, and President of Argyle Coin.  He is a signatory on the Natural Diamonds, Eagle, and Argyle Coin bank accounts.

21.     Harold Seigel is a resident of West Palm Beach, Florida.  Together with his son, J. Seigel, he owns half of Natural Diamonds and Eagle.  H. Seigel is Vice President of Natural Diamonds and President of Eagle.  Beginning no later than 2010, he has hosted a weekly radio show called "The World Financial Report" ("Radio Show") that has now become a weekly online podcast by the same name, in which he touts investment opportunities.

5

22.     Jonathan Seigel resides in Parkland, Florida and owns 10% of Natural Diamonds and Eagle.  J. Seigel is the Secretary of Natural Diamonds.

## B. Relief Defendants

23.     H.S. Management Group LLC ("H.S. Management") is an active Florida limited liability company H. Seigel formed in February 2014, with a principal place of business in Parkland, Florida.  H. Seigel is its sole managing member.  From May 2014 until December 2018, Eagle paid H.S. Management at least $3.8 million in ill-gotten gains.  Without any legitimate basis, H.S. Management received investor proceeds emanating from the Natural Diamonds, Eagle, and Argyle Coin securities frauds.

24.     Gold 7 of Miami, LLC ("G7") is an active Florida limited liability company formed in February 2010.  It is a pawn shop with its principal place of business is Miami, Florida.  G7 received, through consignment agreements Aman executed on his own behalf, approximately 40 diamonds that belong to Natural Diamonds and Eagle.  Without any legitimate basis, G7 received these diamonds, which Aman consigned in order to obtain personal loans.  G7 is still in possession of these diamonds, which are the ill-gotten gains of the Natural Diamonds and Eagle securities frauds.

25.     Winners Church International Inc. of West Palm Beach, Florida ("Winners Church") is an active Florida not-for-profit corporation incorporated in November 1985 with a principal place of business in West Palm Beach, Florida.  Aman is a director of Winners Church, Frederick D. Shipman ("F. Shipman") is its president, and Whitney Shipman ("W. Shipman") is a director.  From May 2014 until December 2018, Eagle paid Winners Church at least $1 million in ill-gotten gains.  Without any legitimate basis, Winners Church received investor proceeds emanating from the Natural Diamonds, Eagle, and Argyle Coin securities frauds.

26.     Frederick D. Shipman is the president of Winners Church.  F. Shipman is the father of W. Shipman.  From August 2014 until August 2018, Eagle paid F. Shipman at least $700,000 in ill-gotten gains.  Without any legitimate basis, F. Shipman received investor proceeds emanating from the Natural Diamonds, Eagle, and Argyle Coin securities frauds.

27.     Whitney Shipman is a director of Winners Church.  From January 2015 until April 2018, Eagle paid W. Shipman at least $40,000 in ill-gotten gains.  Without any legitimate basis, W. Shipman received investor proceeds emanating from the Natural Diamonds, Eagle, and Argyle Coin securities frauds.

### III.  JURISDICTION AND VENUE

28.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a); and Sections 21(d), 21(e), and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.

29.     This Court has personal jurisdiction over the Defendants and Relief Defendants, and venue is proper in the Southern District of Florida, because many of the Defendants' acts and transactions constituting or resulting from violations of the Securities Act and the Exchange Act occurred, and as to Aman and Argyle Coin continue to occur, in the Southern District of Florida. Natural Diamonds, Eagle, and Argyle Coin all have their principal place of business in the Southern District of Florida, and Aman and the Seigels reside in the Southern District of Florida. The Relief Defendants are all located in the Southern District of Florida.   The Corporate Defendants' bank accounts are all located in the Southern District of Florida, and Aman is a signatory on those accounts.

30.     In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

## IV.  THE NATURAL DIAMONDS SECURITIES FRAUD

### A.     The Natural Diamonds Offering

31.     From approximately May 2014 through at least December 2018, Natural Diamonds, Aman, and the Seigels offered and sold Natural Diamonds investment contracts to the public.

32.     The offering documents consisted of a Natural Diamonds Investor Agreement (the "Natural Diamonds Investment Contract") that H. Seigel or J. Seigel signed on behalf of Natural Diamonds.  [Exhibit 1].  No registration statement was filed with the Commission or in effect for the Natural Diamonds offering.

33.     The Natural Diamonds Investment Contract states that the investor is investing with Natural Diamonds and that the investor's funds "shall be used at the sole discretion" of Natural Diamonds to purchase high grade diamonds.

34.     The Natural Diamonds Investment Contract warrants that Natural Diamonds will "procure the appropriate diamond(s) for this specific investment" within 30 days of receiving the investor's funds.

35.     Natural Diamonds would then purportedly cut, polish, and sell the diamonds for a profit.  According to the Natural Diamonds Investment Contract, in return for their investment, investors would receive 2% simple interest per month for 24 months and at the end of the 24-month period Natural Diamonds would pay investors a return of their principal.

8

36.     In some instances, Natural Diamonds also provided investors with a "Negotiable Promissory Note" which references the Natural Diamonds Investment Contract and which one of the Seigels signed (the "Promissory Note"). [Exhibit 2].   The Promissory Note promises that Natural Diamonds would pay investors a 2% monthly interest and return investors' principal investment amount at the end of the 24-month period.

37.     Investors lacked expertise in diamonds and had no involvement in how Natural Diamonds identified, selected, purchased, cut, polished, or sold the diamonds.   Investors had no discretion over how Natural Diamonds, Aman, and the Seigels would use their investment funds. Instead, they relied on Natural Diamonds, Aman, and the Seigels to make all decisions that would affect the profitability of the Natural Diamonds investment.

38.     Investors contributed to the Natural Diamonds offering by sending investment funds to Natural Diamonds or its law firm via wire transfer or check.

39.     From August 2016 until December 2018, Natural Diamonds raised at least $1,798,000 from about 133 investors, including unaccredited investors, located throughout the United States and Canada.

### B.  Solicitation of Natural Diamonds Investors

40.     From no later than May 2014 until at least December 2018, Natural Diamonds and the Seigels solicited investors in the Natural Diamonds offering.

41.     H. Seigel solicited investors through one-on-one conversations in at least 2015 and through his Radio Show from at least February through April 2017.  From no later than November 2015 until at least November 2017, J. Seigel solicited investors verbally through telephone calls and conversations, and occasionally via email messages.

42.     For example, on at least February 24, 2017, March 10, 2017, and April 13, 2017, H. Seigel solicited prospective investors in the United States and Canada through his Radio Show. In the February 24, 2017 episode, H. Seigel touted Natural Diamonds as an investment opportunity "which pays 24% per a year in return on investment." Similarly, on March 10, 2017, H. Seigel again touted Natural Diamonds as an investment offering a 24% a year investment return, and on April 13, 2017, H. Seigel told his listeners that Natural Diamond investors were receiving a 25% investment return each year.

43.     After prospective investors heard the Radio Show, they contacted H. Seigel to get more information and he put them in contact with J. Seigel. J. Seigel then provided prospective investors with more information about the Natural Diamonds offering and closed the deal.

44.     For example, during the first half of 2017, after learning about Natural Diamonds and the investment returns from H. Seigel through the Radio Show, a veterinarian with initials A.C. from Lloyd Harbor, New York (the "Veterinarian") spoke with J. Seigel. J. Seigel told the Veterinarian that Natural Diamonds offered investors a 2% monthly investment return for a period of 24 months, and would return the Veterinarian's principal investment amount to him at the end of the 24-month period.

45.     During this conversation, J. Seigel continued the solicitation effort H. Seigel began. J. Seigel told the Veterinarian, who lacked expertise in diamonds, that Natural Diamonds would use investor funds to buy and sell diamonds. J. Seigel also assured the Veterinarian that the investment would be safe and secure, and that it would be guaranteed by diamonds worth 10 times the amount the Veterinarian invested. At no time did J. Seigel disclose any risks associated with the investment. Nor did J. Seigel disclose to the Veterinarian that investor funds would be used to

pay commissions or fees, or that it would be used to pay other investors their purported investment returns.

46.     Based on what J. Seigel represented to the Veterinarian, he decided to invest.  On June 7, 2017, the Veterinarian invested $50,000 in Natural Diamonds.  In exchange for the investment, J. Seigel executed a Natural Diamonds Investment Contract with the Veterinarian dated June 7, 2017 as well as a Promissory Note dated June 9, 2017.  These documents promised the Veterinarian that Natural Diamonds would pay him the promised investment returns of 2% each month for 24 months (or until June 2019), at which time it would pay him an amount equal to his investment principal.

47.     Natural Diamonds failed to make all of the promised payments to the Veterinarian. In November or December 2018, Natural Diamonds stopped sending the Veterinarian his monthly investment returns. H. Seigel contacted the Veterinarian to assure him that Natural Diamonds would return his investment principal.  However, this never happened.

48.     J. Seigel also solicited investors directly and then put them in contact with H. Seigel to secure the investment.  For example, in late 2015, J. Seigel approached a tour bus driver with the initials R.B. who resides in Montana and Alberta, Canada (the "Bus Driver").  J. Seigel told the Bus Driver that Natural Diamonds was in the business of locating and purchasing diamond parcels to cut and resell for a profit.  J. Seigel told the Bus Driver that Natural Diamonds used investor funds to buy the diamonds, and then paid investors returns from Natural Diamonds' profits after selling the diamonds.

49.     During this conversation with the Bus Driver, J. Seigel touted the safety and security of investing in Natural Diamonds, assuring him that the investment was backed by

valuable diamonds.  He also encouraged the Bus Driver to speak with H. Seigel about the investment.

50.     J. Seigel also emailed the Bus Driver on November 10, 2015, telling the Bus Driver that he was one of the "lucky few" who could see the diamonds and attaching photos of them, which J. Seigel wrote were "two of the rarest rough colored diamond parcels around today."

51.     Later in November 2015, J. Seigel sent the Bus Driver a document J. Seigel signed entitled "N.D.I.C. Secured Investments," which stated it was for the purpose of advising "potential and current investors."  In this document, J. Seigel represented that:

> [Natural Diamonds'] is properly and adequately funded and able to secure every investors investment.  For every dollar raised [Natural Diamonds] matches that amount with hard assets and safeguards them inside a trust account safety deposit box at a local bank. [Natural Diamonds] is consistently buying and selling diamonds, in order to grow and provide promised returns to its investors.
>
> ----
>
> If it were ever required, for any unforeseeable reason, [Natural Diamonds] promises to sell the above-mentioned diamond(s) and use the proceeds towards paying back the principal investment to each investor.  Although the founders of this Company know that investing in diamonds is a relatively low risk venture, it has taken proper measures to ensure the integrity of the investments by our valued customers.

52.     In about November 2015, shortly after J. Seigel encouraged the Bus Driver to speak with H. Seigel, H. Seigel told the Bus Driver that Natural Diamonds would pay him 2% monthly returns and would return his principal to him after 24 months.

53.     Neither J. Seigel nor H. Seigel ever disclosed any risks associated with investing in Natural Diamonds or any fees or commissions paid from investor funds.  Nor did they tell the Bus Driver that Natural Diamonds would use his investor funds to pay investors their purported returns or for anything other than buying, cutting, and polishing diamonds.  Instead, the Seigels both assured the Bus Driver that Natural Diamonds had diamonds to secure the investment and that his investment would never be at risk.

54.     Based on what the Seigels represented to him, on December 7, 2015, the Bus Driver invested $25,000 in Natural Diamonds by sending a wire transfer to the trust account for the lawyer of Natural Diamond (the "Law Firm").  The Law Firm, at the direction of J. Seigel, sent the Bus Driver a Natural Diamonds Investment Contract dated December 7, 2015 and signed by J. Seigel on behalf of Natural Diamonds.

55.     Natural Diamonds then sent the Bus Driver a Promissory Note dated December 9, 2015, and signed by J. Seigel.

56.     In both the Natural Diamonds Investment Contract and Promissory Note, Natural Diamonds warranted that it would pay the Bus Driver a 2% investment return each month for 24 months and would pay him his $25,000 investment principal at the end of the 24-month period.

57.      In December 2017, the Bus Driver contacted J. Seigel and asked Natural Diamond to return his principal.  J. Seigel, and then Aman, both responded to the Bus Driver's inquiry by promising that Natural Diamonds would make the $25,000 payment to him.  However, despite numerous inquiries, Natural Diamonds has never made this payment.

58.     J. Seigel also solicited Eagle investors to invest in Natural Diamonds.

59.     For example, in 2015, H. Seigel and J. Seigel had successfully solicited an investment in Eagle from an individual whose initials are B.B. and who resides in Alberta, Canada, where he works in the insurance industry (the "Insurance Worker").  In Spring 2017, when Eagle was supposed to return the Insurance Worker's investment principal, the Insurance Worker called J. Seigel, who offered the Insurance Worker an investment in Natural Diamonds.

60.     During this telephone call, J. Seigel told the Insurance Worker that Natural Diamonds would use investor funds to acquire, cut, polish, and resell diamonds, and that Natural Diamonds would pay him a 2% monthly investment return for a period of 24 months, and would

return his principal investment amount to him at the end of the 24-month period.  At no time did J. Seigel disclose any risks associated with the investment.  Nor did J. Seigel disclose to the Insurance Worker that investor funds would be used to pay commissions or fees, or that it would be used to pay other investors their purported investment returns.

61.     Based on what J. Seigel represented to the Insurance Worker during the Spring telephone call, the Insurance Worker invested $10,000 in Natural Diamonds on April 27, 2017 by sending a wire transfer to Natural Diamond's bank account.

62.     In exchange, Natural Diamonds provided the Insurance Worker with a Promissory Note signed by H. Seigel and dated April 27, 2017 that promised investment returns for 24 months (or until May 2019).  Natural Diamonds stopped paying the Insurance Worker his investment returns in early 2019 and failed to return his principal investment amount.

### C. **Fraudulent Conduct in the Natural Diamonds Offering**

63.     In connection with the Natural Diamonds offering, Natural Diamonds and Aman engaged in fraudulent conduct.

64.     As an officer and owner of Natural Diamonds, as well as a signatory on Natural Diamonds bank accounts, Aman knew, or was reckless in not knowing, the representations made to investors about the offering and falsity of the representations.

65.     Contrary to the representations to investors in the Natural Diamonds Investment Contract and Promissory Note that Natural Diamonds would use investor funds to purchase, cut, polish, and resell diamonds for profits, Aman and Natural Diamonds siphoned investor funds to Eagle and Argyle Coin and used investor funds to pay investors their purported investment returns.

66.     From no later than October 4, 2016 until at least December 24, 2018, Natural Diamonds transferred Natural Diamonds investor funds to Eagle.  From no later than March 5,

2018 until at least December 21, 2018, Natural Diamonds transferred investor funds to Argyle Coin.

67.     From May 2017 until December 2018, Aman received more than $75,000 from Natural Diamonds.

68.     Natural Diamonds sent F. Shipman $5,000 on April 10, 2018, and Winners Church $1,000 on December 18, 2018, for no legitimate reason.

69.     From no later than August 2016 until December 2018, Natural Diamonds used Natural Diamonds investors' funds, together with money from Eagle and Argyle Coin, to transfer via wire or check about $2,930,000 to 128 Natural Diamonds investors as the purported interest payments on their investments.

70.     For example, on August 26, 2016, an individual investor wired his $49,990 investment to Natural Diamonds. Prior to this investment deposit, this Natural Diamonds account had a balance of $500. Between August 30, 2016 and September 6, 2016, Natural Diamonds wired about $34,000 of the $49,990 of investor funds to 22 Natural Diamonds investors and noted on the wire transfers that these were for an "interest payment."

71.     As another example, on September 23, 2016 an individual invested $249,980 in Natural Diamonds via wire transfer to the Natural Diamonds' bank account.  Prior to this investment, this Natural Diamonds account had a balance of $9,560.97. Between October 3, 2016 and October 13, 2016, Natural Diamonds wired about $51,000 of the $249,980 of investor funds to 25 Natural Diamonds investors and noted on the wire transfers that these were for "October Interest."

72.     Between October 3, 2016 and October 13, 2016, Natural Diamonds sent $106,000 of the September 23, 2016 investment funds to 62 Natural Diamonds investors and noted on the wire transfers that these were for "October Interest, NDIC Monthly Interest."

73.     As of February 28, 2019, the Natural Diamonds bank accounts had negative balances of about $120,000.

## IV.   THE EAGLE SECURITIES FRAUD

### A. The Eagle Offering

74.     From approximately March 2015 through at least December 2018, Eagle, Aman, and the Seigels offered and sold Eagle investment contracts to the public.  No registration statement was filed with the Commission or in effect for the Eagles offering.

75.     The offering documents consisted of an Eagle "Contract for Investment" (the "Eagle Investment Contract") that H. Seigel signed on behalf of Eagle.

76.     The Eagle Investment Contract provides that the investor enters into a one-time partnership with Eagle in which Eagle will cut, polish and sell a diamond parcel for a profit. Specifically, it states:

> [T]he investment shall take place over an eighteen (18) month period whereby Eagle will cut, polish, and grade said Rough Diamond Parcel.  Eagle requires a certain amount of time (reserved to the discretion of Eagle) to sell said parcel at profit and by way of this Contract warrants a 100% return to [investor] on said investment in addition to return of the initial principal.  Afore said [sic] 100% return and initial principal shall be returned to Investor eighteen (18) months after execution of this agreement or as otherwise agreed by both parties by amendment to this agreement. [Exhibit 3].

77.     Eagle selected the diamonds to purchase and Aman had specialized education and training in inspecting and cutting diamonds.

78.     Eagle investors lacked expertise in diamonds and had no involvement in how Eagle identified, selected, purchased, cut, polished, or sold the diamonds.  Investors had no discretion

over how Eagle, Aman, and the Seigels would use their investment funds. Instead, they relied on Eagle, Aman, and the Seigels to make all decisions that would affect the profitability of the Eagle investment.

79.    Investors contributed to the Eagle offering by sending investment funds to Eagle or its law firm via wire transfer or check.

80.    From March 2015 until December 2018, Eagle raised at least $25.6 million from 276 investors, including unaccredited investors, located throughout the United States and Canada.

### B. Solicitation of Eagle Investors

81.    Eagle and J. Seigel solicited investors by representing that Eagle would double investors' money in 18 or 24 months.

82.    From at least November 2015 until at least April or May 2017, J. Seigel solicited potential investors via telephone.

83.    For example, in about May 2015, the Insurance Worker began listening to the Radio Show, where H. Seigel touted investments backed by rare colored diamonds and provided listeners with his telephone number. The Insurance Worker called H. Seigel, who then put him in contact with J. Seigel to discuss the Eagle investment opportunity.

84.    In the second half of 2015, J. Seigel told the Insurance Worker that Eagle was in the business of locating and purchasing diamond parcels to cut and resell for a profit, and that Eagle used investor funds to buy and sell diamonds. J. Seigel told the Insurance Worker that Eagle paid investors from the proceeds of the diamond sales, and that Eagle would double his money and pay him a 100% return on his principal in 18 months.

85.    J. Seigel lured the Insurance Worker by touting his family's expertise and time in the diamond business, and said that investment funds would be safe and secure because valuable

17

diamonds backed the Eagle investment opportunity. J. Seigel did not disclose any risks associated with the investment or that investor funds would be used to pay other investors their purported investment returns.

86.     J. Seigel emailed the Insurance Worker an Eagle Investment Contract. On about November 9, 2015, the Insurance Worker invested in Eagle by executing the Investment Contract and wiring $25,000 to Eagle.

87.     In April or May 2017, J. Seigel solicited the Insurance Worker to make a second investment in Eagle. J. Seigel emailed the Insurance Worker a second Eagle Investment Contract and reassured him that Eagle would double his money again in 18 months. Based on these representations, the Insurance Worker made a second investment for $25,000 in April or May 2017.

88.     As another example, on about June 7, 2017, J. Seigel told the Veterinarian that Eagle was in the diamond business and guaranteed investor funds with rare colored diamonds. J. Seigel told the Veterinarian that Eagle would use investor funds to buy colored diamonds, including rough parcels, and cut them into smaller pieces for resale. J. Seigel represented to the Veterinarian that he would double his money in 18 to 24 months.

89.     During this conversation, J. Seigel told the Veterinarian that investing with Eagle was safe and secure, and that Eagle secured the investments with diamonds. He never disclosed any risks associated with the investment or that Eagle would use investor funds to pay investors purported investment returns.

90.     Based on J. Seigel's representations, the Veterinarian invested $50,000 with Eagle on June 7, 2017. In exchange, Eagle provided the Veterinarian with an Eagle Investment Contract that H. Seigel signed.

## C.  Fraudulent Conduct in the Eagle Offering

91.    In connection with the Eagle offering, Eagle and Aman engaged in fraudulent conduct.

92.    As an officer and owner of Eagle, as well as a signatory on Eagle's bank accounts, Aman knew, or was reckless in not knowing, the representations made to investors about the offering and falsity of the representations.

93.    Contrary to the representations to investors that Eagle would use investor funds to purchase, cut, polish, and resell diamonds for profits, Aman and Eagle used investor funds to pay investors their purported investment returns.  They also siphoned investor funds to Natural Diamonds to pay investors their purported returns, and used investor funds to make expenditures that served no legitimate business purpose.  Natural Diamond investors' funds were commingled with Eagle investor funds and Argyle Coin investor funds.

94.    As an example of how the Ponzi scheme in Eagle operated, on May 29, 2018 an individual investor contributed $170,000 to Eagle.  Prior to this investment, this Eagle bank account had a negative balance, of -$24,976.32.   On May 31, 2018, Eagle used $25,000 of the $170,000 in investor funds to pay an investor.

95.    Between May 30, 2018 and May 31, 2018, Eagle wired about $57,512 of the May 29th investor's funds into another bank account Eagle held.  Prior to the receipt of this wire transfer, this second Eagle bank account had a negative balance of $46,370.30.  After the incoming transfer of $57,512 in investor funds, the second Eagle bank account had a balance of about $20,817.  It then transferred about $7,500 Aman's ex-wife on May 31, 2018.

96.    As another example, on April 16, 2018 an individual investor contributed $218,000 to Eagle via wire transfer (with the notation "investment-diamonds").  Prior to this investment,

Eagle's bank account had a negative balance. of -$52,980.57.  On April 17, 2018 Eagle transferred $25,000 of the April 16th investor's funds to another Eagle investor.

97.     Eagle also transferred Eagle investors' funds to Natural Diamonds so they could be used to pay Natural Diamonds investors their purported investment returns.

98.     For example, on April 18, 2018, Eagle transferred $50,000 of Eagle investors' funds to a Natural Diamonds bank account.  Prior to the receipt of these funds, the Natural Diamonds bank account had a balance of $17,825.87.  After receiving the $50,000 transfer, Natural Diamond paid approximately $53,000 in interest payments to four individual investors.  Without the $50,000 of Eagle investor funds, Natural Diamonds would not have had adequate funds in its account to make these interest payments.

99.     Eagle commingled investors' funds with the Natural Diamonds bank accounts from no later than July 21, 2017 until at least June 22, 2018, and with the Argyle Coin bank accounts from no later than May 31, 2018 until at least February 22, 2019.

100.    Additionally, from May 2016 until December 2018, Eagle spent $453,485, which included some investors' funds, to purchase horses and horse riding lessons for Aman's adult son.

101.    Between August 21, 2014 and August 16, 2018, Eagle gave about $747,125, including investor funds, to F. Shipman, without any legitimate purpose.

102.    Between May 2014 and December 2018, Eagle gave about $1,038,992, which included investor funds, to the Winners Church.  There was no legitimate business purpose for this transfer of funds.  For example, on July 18, 2016, Aman signed a check from the Eagle bank account payable to Winners Church for $69,500, with the notation "Donation."  On August 17, 2016, Aman signed a check from the Eagle bank account payable to Winners Church for $30,000 with the notation "My Kids."  Similarly, on October 2, 2016, Aman signed a check from the Eagle

bank account payable to Winners Church for $50,000 with the notation "My Kids."  Some of the other checks Aman sent Winners Church from the Eagle Account included a notation for "tithing" and one included the notation that it was for a "trip to Israel."

103.    During this same time period, Eagle gave $3,806,661, which included investor funds, to H.S. Management Group.

104.    From June 2014 until February 2019, Aman took more than $1.5 million, which included investors' funds, from Eagle.  During this same timeframe, he also took at least $1.9 million of Eagle funds, including investors' funds, to pay for his child's tutoring sessions, to shop at Gucci, pay his rent, and make his divorce settlement payments to his ex-wife.

105.    As of February 28, 2019, the Eagle bank accounts had a combined balance of $155.26.

## V. **THE ARGYLE COIN FRAUD**

### A. **The Argyle Coin Offering**

106.    From approximately December 2017 through present, Argyle Coin, Aman, and the Seigels have offered and sold investments in a supposed cryptocurrency token called "RGL" ("RGL Tokens") that is purportedly backed by fancy colored diamonds.   No registration statement was filed with the Commission or in effect for the Argyle Coin offering.

107.    Argyle Coin is distributing a "White Paper" [Exhibit 4] through its website that describes its planned business model and provides the following dates for its initial coin offering ("ICO"):

> (1) initial pre-sale offering from December 2017 through August 26, 2018;
> (2) pre-ICO August 27, 2018 through October 16, 2018; and
> (3) crowd-funding (ICO) October 17, 2018 through November 27, 2018.

108.     Argyle Coin investors receive a contract documenting their investment in RGL Tokens (the "Argyle Coin Contract") that is signed by Aman [Exhibit 5].

109.     The Argyle Coin Contract provides, among other things, that the "investor" is "investing" in the "Argyle Coin Project," which is comprised of the launch and subsequent administration of the cryptocurrency RGL Tokens.  It also provides that the investor will receive an 8% return on the principal amount invested after a 12-month period and an additional 2% return at the end of a 24-month period if the investor elects to extend the investment for an additional 12 months.

110.     Investors lacked expertise in diamonds and had no involvement in how Argyle Coin operated, the development of cryptocurrency, or any business decisions whatsoever.  Instead, they relied on Argyle Coin and Aman to make all decisions that would affect the profitability of the Argyle Coin investment.

111.     Investors sent their investment funds to a bank account in the name of Argyle Coin via wire transfer or check.

112.     From January 2018 through March 31, 2019, Argyle Coin raised approximately $2,670,000 from 59 investors, including unaccredited investors, through the sale of RGL Tokens.

**B.  <u>Solicitation of Argyle Coin Investors</u>**

113.     From at least as early as October 2018 until present, Argyle Coin has marketed the RGL Tokens to investors through the White Paper and its website, https://www.argylecoin.io [Exhibit 5].

114.     Beginning no later than October 2017, Aman and J. Seigel have also solicited investors directly.  For example, in May 2018, J. Seigel contacted an Eagle investor with the initials M.U. who works in oil field construction in Alberta, Canada (the "Oil Field Worker").  J. Seigel

told him that Argyle Coin was offering a cryptocurrency token and would use investor funds to buy and sell diamonds and to build a virtual platform where diamonds could be bought and sold online.

115.   J. Seigel told the Oil Field Worker that the Argyle Coin investment was safe and secured by $25 million in diamonds that Argyle Coin stores in a vault.  J. Seigel also told him that the investment was guaranteed by an insurance bond.  At no time did J. Seigel disclose any risks associated with the investment or that investor funds would be used to pay investors purported investment returns.

116.   J. Seigel told the Old Field Worker that Argyle Coin would pay investment returns of 8% after one year, and an additional 2% return for a two-year investment.  J. Seigel told him that he would have access to his investment funds in the form of "Argyle Coins" through a digital wallet available on Argyle Coin's website.

117.   Based on J. Seigel's representations, the Oil Field Worker invested $10,000 by wiring funds to Argyle Coin's bank account on about May 24, 2018.  On that same day, the Oil Field Worker signed an Argyle Coin Contract and returned it to Argyle Coin via email.

118.   Aman also solicited investors.  For example, in October 2017, Aman solicited a professional football player who resides in Wellington, Florida (the "Football Player").  Aman told the Football Player that Argyle was a cryptocurrency business that was unique because it was backed by fancy colored diamonds.  Aman emphasized the safety and security of the investment, and told the Football Player there was no risk to this investment because it was backed by the diamonds and guaranteed by an insurance bond.

119.   Aman told the Football Player that Argyle Coin would use investor funds to develop the business, and that he would receive a return on his investment within one year of investing.

Aman did not disclose any risks associated with the investment or that investor funds would be used to pay investors their purported investment returns.

120.    Based on Aman's representations, the Football Player invested by wiring $500,000 to the Eagle bank account on about October 23, 2017, and executed an Argyle Coin Contract.

121.    Argyle Coin has not paid the Football Player any investment return. Nor has it given him access to his supposed digital wallet of Argyle Coins.

122.    Argyle Coin also solicits investors through its website, which publishes the White Paper. In the White Paper, Argyle Coin states the Pre-ICO beginning in August 2018 would launch for 3,462,000 coin units at $10 per unit (seeking to raise a total of $34,620,000).

123.    In the White Paper, Argyle Coin states it will create its own Coin Exchange "that will be an industry leader by interfacing with other Blockchains such as Bitcoin, Ethereum, & LiteCoin," and claims to be the only cryptocurrency that will make it possible for individuals to trade diamonds on a virtual platform using "smart contracts."

124.    Argyle Coin also claims in the White Paper that it is the only cryptocurrency backed by $25 million of fancy colored diamonds, which have been purchased by Argyle Coin's principals.

125.    Argyle Coin represents in the White Paper that it will use 60% of the funds raised during the ICO to purchase additional diamonds.

126.    Argyle Coin also represents in the White Paper that revenues will come from (1) issuance and maturity of the currency; (2) managing a coin exchange; and (3) facilitating funding pools for the purchase of high-worth rare stones.

127.    The White Paper also includes statements by Argyle Coin that it plans to obtain a "guarantee bond" that is intended to return investor funds in the event that Argyle Coin fails to develop a working platform and the RGL Tokens are not delivered.

### C. <u>Misrepresentations and Omissions in the Argyle Coin Offering</u>

128.    In connection with the Argyle Coin offering, Aman and Argyle Coin knowingly or recklessly made material misrepresentations and omissions about the use of investor funds and the safety of the investment.

129.    Contrary to the representations to investors that Argyle Coin would use investor funds to develop the cryptocurrency, Aman and Argyle Coin used investor funds to pay investors their purported investment returns.  They also siphoned off at least $1.6 million of Argyle Coin investor funds and transferred them to Natural Diamonds and Eagle in order to pay investors their purported returns.

130.    For example, on June 8, 2018, an investor deposited $170,000 into Argyle Coin's bank account via wire transfer.  Before receiving these investor funds, the Argyle Coin bank account had a balance of $3,480.  Upon receipt of the investor funds on June 8, Argyle Coin transferred $123,000 to Natural Diamonds' bank account that same day.  Prior to the receipt of these funds, the Natural Diamonds bank account had a balance of $509.80.  Upon receipt of these funds on June 8, Natural Diamonds sent two wire transfers, totaling $70,000, to Eagle's bank account.  Prior to the receipt of these funds, Eagle's bank account had a balance of $4,184.58.  After receiving these funds on June 8, 2018, Eagle sent two wire transfers to investors totaling $70,500 that same day.

131.    On June 11, 2018 (without having received any other funds since the $170,000 deposit on June 8), Argyle Coin transferred an additional $30,000 to Natural Diamonds, which

then immediately transferred $5,000 of these funds to Eagle, $27,500 to H.S. Management, and $10,000 back to Argyle Coin.

132.    Aman also used Argyle Coin investor funds to cover negative balances in the Natural Diamonds and Eagle bank accounts. For example, on March 8, 2018 an individual investor contributed $149,980 to Argyle Coin. Prior to this investment, the Argyle Coin bank account balance was $32,771.10. After receiving the $149,980 transfer on March 8, Argyle Coin made two wire transfers totaling $133,000 to Natural Diamonds on that same day. When Natural Diamonds received the $133,000 transfer from Argyle Coin on March 8, 2018, the Natural Diamonds bank account had an existing negative balance, of -$104,286.13. After receiving the Argyle Coin investor funds, Natural Diamonds sent two investors funds and notated the payments as "monthly interest."

133.    Argyle Coin gave Aman about $268,000. Also, from August 20, 2018 until December 18, 2018, Argyle Coin gave $42,500 to F. Shipman. From November 13, 2018 until December 4, 2018, Argyle Coin gave $55,000 to Winners Church. There was no legitimate reason for these payments.

134.    Argyle Coin commingled investors' funds with Natural Diamonds from no later than May 17, 2018 until at least February 11, 2019, and commingled investors' funds with Eagle from no later than May 31, 2018 until at least February 22, 2019.

135.    Additionally, contrary to Aman and Argyle Coin's representations to investors that Argyle Coin investments are backed by valuable diamonds, Argyle Coin does not own any diamonds.

136.    Further, contrary to Aman and Argyle Coin's representations to investors that investments were guaranteed by an insurance bond, the terms of the bond required Argyle Coin to

26

develop a cryptocurrency in order for the bond to provide coverage.  As a signatory on the Argyle

Coin, Natural Diamonds, and Eagle bank accounts, Aman knew he was not using investor funds

to develop cryptocurrency but was instead using them to pay other investors in Natural Diamonds

and Eagle, replenish Natural Diamonds and Eagle's negative bank account balances, and pay for

personal expenditures.  Thus he knew or was reckless for not knowing that the bond would not

provide a guarantee for investor money.

137.    As of February 28, 2019, the Argyle Coin bank account held a total of $376.53.

### COUNT I

### Fraud in Violation of Section 10(b) and Rule 10b-5(a) of the Exchange Act
### Against Natural Diamonds, Eagle, Argyle Coin, and Aman

138.    The S.E.C. repeats and realleges paragraphs 1 through 137 of this Complaint.

139.    Aman, beginning no later than May 2014 and continuing through present, Natural

Diamonds, beginning no later than May 2014 until at least December 2018, Eagle, beginning no

later than March 2015 until December 2018, and Argyle Coin beginning no later than October

2017 through present, directly or indirectly, by use of the means and instrumentalities of interstate

commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or

recklessly, employed devices, schemes or artifices to defraud in connection with the purchase or

sale of securities.

140.    By reason of the foregoing, Aman, Natural Diamonds, Eagle, and Argyle Coin,

directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate,

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(a) [17

C.F.R. § 240.10b-5(a)].

## COUNT II
### Fraud in Violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act
**Against Aman**

141.    The Commission repeats and realleges paragraphs 1 through 137 of this Complaint.

142.    Aman, beginning no later than October 2017, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, has knowingly or recklessly made untrue statements of material facts or omitted to state material facts in order to make the statements made, in the light of the circumstances in which they were made, not misleading.

143.    By reason of the foregoing, Aman directly or indirectly violated, and, unless enjoined, is reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)].

## COUNT III
### Fraud in Violation of Section 10(b) and Rule 10b-5(c) of the Exchange Act
**Against Natural Diamonds, Eagle, Argyle Coin, and Aman**

144.    The Commission repeats and realleges paragraphs 1 through 137 of this Complaint.

145.    Aman, beginning no later than May 2014 and continuing through present, Natural Diamonds, beginning no later than May 2014 until at least December 2018, Eagle, beginning no later than March 2015 until December 2018, and Argyle Coin, beginning no later than October 2017 through present, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly engaged in acts, practices, and courses of business which have operated, are now operating, and will operate as a fraud upon the purchasers of such securities.

146.    By reason of the foregoing, Aman, Natural Diamonds, Eagle, and Argyle Coin, directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate,

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(c) [17

C.F.R. § 240.10b-5(c)].

## COUNT IV

### Fraud in the Offer or Sale of Securities in
### Violation of Section 17(a)(1) of the Securities Act
### Against Natural Diamonds, Eagle, Argyle Coin, and Aman

147.    The Commission repeats and realleges paragraphs 1 through 137 of this Complaint.

148.    Aman, beginning no later than May 2014 and continuing through present, Natural

Diamonds, beginning no later than May 2014 until at least December 2018, Eagle, beginning no

later than March 2015 until December 2018, and Argyle Coin, beginning no later than October

2017 through present, directly or indirectly, in the offer or sale of securities, by the use of means

or instruments of transportation or communication in interstate commerce or of the mails have

knowingly or recklessly employed devices, schemes or artifices to defraud.

149.    By reason of the foregoing, Aman, Natural Diamonds, Eagle, and Argyle Coin,

directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate,

Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT V

### Fraud in the Offer or Sale of Securities in
### Violation of Section 17(a)(2) of the Securities Act
### Against Aman

150.    The Commission repeats and realleges paragraphs 1 through 137 of this Complaint.

151.    Aman, beginning no later than October 2017, directly or indirectly, in the offer or

sale of securities, by the use of means or instruments of transportation or communication in

interstate commerce or of the mails has negligently obtained money or property by means of untrue

statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

152.   By reason of the foregoing, Aman, directly or indirectly violated, and, unless enjoined, is reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT VI

### Fraud in the Offer or Sale of Securities in
### Violation of Section 17(a)(3) of the Securities Act
### Against Natural Diamonds, Eagle, Argyle Coin, and Aman

153.   The Commission repeats and realleges paragraphs 1 through 137 of this Complaint.

154.   Aman, beginning no later than May 2014 and continuing through present, Natural Diamonds, beginning no later than May 2014 until at least December 2018, Eagle, beginning no later than March 2015 until December 2018, and Argyle Coin, beginning no later than October 2017 through present, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or of the mails have negligently engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers.

155.   By reason of the foregoing, Natural Diamonds, Eagle, Argyle Coin, and Aman, directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT VII

### Sale of Unregistered Securities in Violation of
### Sections 5(a) and 5(c) of the Securities Act
### Against All Defendants

156.    The Commission repeats and realleges paragraphs 1 through 137 of this Complaint as if fully set forth herein.

157.    No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities and transactions issued by Natural Diamonds, Eagle, or Argyle Coin as described in this Complaint and no exemption from registration existed with respect to these securities and transactions.

158.    Aman, beginning no later than May 2014 and continuing through present, Natural Diamonds, beginning no later than May 2014 until at least December 2018, Eagle, beginning no later than March 2015 until December 2018, Argyle Coin, beginning no later than October 2017 and continuing through present, H. Siegel, beginning no later than May 2014 until at least December 2018, and J. Seigel, beginning no later than May 2014 until at least December 2018, directly and indirectly:

(a)    made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell securities as described herein, through the use or medium of a prospectus or otherwise;

(b)    carried securities or caused such securities, as described herein, to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

(c)    made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of a

prospectus or otherwise, as described herein, without a registration statement having been filed or being in effect with the Commission as to such securities.

159.    By reason of the foregoing, the Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court find that Defendants committed the violations alleged and:

### I.

### Temporary Restraining Order And Preliminary Injunction

Issue a Temporary Restraining Order and Preliminary Injunction, restraining and enjoining: Defendants Aman and Argyle Coin, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 17(a) of the Securities Act, Section 10(b) and Rule 10b-5 of the Exchange Act, and Sections 5(a) and (c) of the Securities Act.

### II.

### Permanent Injunction

Issue a Permanent Injunction, enjoining all Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 17(a) of the Securities Act, Section 10(b) and Rule 10b-5 of the Exchange Act, and Sections 5(a) and (c) of the Securities Act.

### III.

### Asset Freeze and Sworn Accountings

Issue an Order freezing the assets of Aman and Argyle Coin until further Order of the Court and freezing assets of H. Seigel, H.S. Management, Winners Church, S. Shipman, and W. Shipman up to the amount of the ill-gotten gains each received until further Order of the Court, issuing a limited asset freeze as to G-7 to include the Corporate Defendants' diamonds Aman consigned to G-7 until further Order of the Court, and requiring Aman and Argyle Coin to file sworn accountings with this Court.

### IV.

### Records Preservation

Issue an Order requiring all Defendants and Relief Defendants to preserve any records related to the subject matter of this lawsuit that are in their custody or possession or subject to their control.

### V.

### Disgorgement

Issue an Order directing all Defendants and Relief Defendants to disgorge all ill-gotten gains received within the applicable statute of limitations, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

### VI.

### Penalties

Issue an Order directing all Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## VII.

### <u>Appointment of a Receiver</u>

Appoint a receiver over Defendant Argyle Coin.

## VII.

### <u>Further Relief</u>

Grant such other and further relief as may be necessary and appropriate.

## IX.

### <u>Retention of Jurisdiction</u>

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

### <u>DEMAND FOR JURY TRIAL</u>

The Commission hereby demands a jury trial in this case.

May 13, 2019                    Respectfully submitted,

By:

Amie Riggle Berlin, Esq.
Senior Trial Counsel
Florida Bar No. 630020
Direct Dial: (305) 982-6322
Direct email: berlina@sec.gov

Attorney for Plaintiff
**SECURITIES AND EXCHANGE    COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154