**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**(Palm Beach Division)**

**Case No. 9:19-CV-80633-ROSENBERG**

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

NATURAL DIAMONDS INVESTMENT CO.,
et al.,

      Defendants,

H.S. MANAGEMENT GROUP LLC, et al.,

      Relief Defendants.

_____/

## SECOND QUARTERLY STATUS REPORT OF RECEIVER JEFFREY C. SCHNEIDER

Pursuant to paragraphs 46 and 47 of Section XII of the Order Granting Plaintiff Securities and Exchange Commission's Motion for Appointment of Receiver [DE 20] (the "Appointment Order"), Jeffrey C. Schneider, not individually, but solely in his capacity as the Court-appointed Receiver (the "Receiver") for Natural Diamonds Investment Co. ("NDIC"), Eagle Financial Diamond Group, Inc. ("EFDG"), and Argyle Coin, LLC ("Argyle") (collectively, the "Receivership Entities"), submits his Second Quarterly Status Report for the quarter ending September 30, 2019.

## INTRODUCTION

On May 16, 2019, this Court appointed me as Receiver for Argyle.  On March 28, 2019, approximately two months before my appointment as Receiver in this case, the Honorable Donald Middlebrooks appointed me as Corporate Monitor for NDIC and EFDG in *Rounds v. Natural Diamonds Investment Co., et al.*, Case No. 18-cv-81151 (the "Corporate Monitor Action").  I filed

a motion requesting that this receivership be expanded to include NDIC and EFDG in order to streamline the two proceedings, avoid two separate proceedings, and reduce expenses for the benefit of the victims of the fraud [DE 97, 104].  On July 11, 2019, this Court granted that request and issued an Order expanding the receivership to include NDIC and EFDG [DE 97, 104].  Because NDIC and EFDG are now part of the receivership, the work previously done in the Corporate Monitor Action for NDIC and EFDG was previously discussed in my First Quarterly Status Report [DE 111-1], and where applicable, will be discussed herein.  I have also since moved to close the Corporate Monitor Action.  On October 25, 2019, Judge Middlebrooks granted that motion.

Pursuant to paragraph 46 of the Appointment Order, I am required to file Quarterly Status Reports within 30 days of the end of each calendar quarter.  The last quarter ended on September 30, 2019, so I am filing this Second Quarterly Status Report by the October 30th deadline.

Pursuant to paragraph 47 of the Appointment Order, I will discuss the following topics in this Report:

A.  A summary of my operations;

B.  The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.  A schedule of all the receipts and disbursements (attached as Exhibit A to the Quarterly Status Report) of the receivership, with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D.  A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.  A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims

(including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.  A list of all known creditors with their addresses and the amounts of their claims;

G.  The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

H.  My recommendations for a continuation or discontinuation of the receivership and the reason for the recommendations.

As required, I will address these topics one-by-one below.

**A.  A Summary of the Operations of the Receiver**

**1.  Procedural Background in This Proceeding**

On May 13, 2019, Plaintiff Securities and Exchange Commission (the "SEC") filed an emergency action in this Court to enjoin NDIC, EFDG (a/k/a Diamante Atelier), and Argyle (again, the "Receivership Entities"), and their owners, Jose Aman, Harold Seigel and Jonathan Seigel.  In the Complaint [DE 1], the SEC asserted various claims against the Receivership Entities, Aman, and the Seigels.  Essentially, the SEC alleged that the Receivership Entities were a three-tiered Ponzi scheme that promised hundreds of investors unreasonably large investment returns that ranged from 24% to 100% every year to two years for signing investment contracts that were supposedly backed by diamonds worth tens of millions of dollars.  The SEC alleged that the Receivership Entities raised approximately $30 million from approximately 300 investors in Canada and the United States from late 2013 through the present.

The SEC also filed a Motion for Temporary Restraining Order, Asset Freeze, and Other Relief [DE 4] and a Motion for Appointment of Receiver [DE 7].  The SEC advised this Court that I had been appointed as Corporate Monitor for NDIC and EFDG in the Corporate Monitor Action, which was then also pending in the Southern District of Florida.

As a result of the SEC's efforts, this Court granted the SEC's requests and, among other things, appointed me as Receiver for Argyle. This compelled me to, among many other things, assume full control of Argyle and to secure, conserve, hold, manage, and prevent the loss of its assets. Similarly, given the recent expansion of the receivership to include NDIC and EFDG, this brought NDIC and EFDG into the fold of this case, with concomitant obligations to secure, conserve, hold, manage, and prevent the loss of NDIC's and EFDG's assets.

There are currently asset freezes over Defendants Aman, Harold Seigel and H.S. Management Group LLC, which is a Seigel entity that received millions of dollars from the Receivership Entities and a current relief defendant in this action [DE 40]. In addition, there are currently asset freezes over the other relief defendants, including approximately $2 million frozen in accounts in the names of Relief Defendants Winners Church and Frederick and Whitney Shipman [DE 59] and dozens of identified diamonds and jewelry pieces held by Relief Defendant Gold 7 of Miami, LLC ("G7") [DE 55]. Regarding Winners Church and the Shipmans, I testified at the May 23, 2019 show cause hearing, after which there were additional submissions; this Court ultimately imposed asset freezes over their assets [DE 59].

Since my appointment, my professionals[1] and I have been working to effectuate my obligations under the Appointment Order. As discussed more fully below, this work has primarily involved identifying and securing assets of the Receivership Entities, as well as preserving all relevant books and records regarding the Receivership Entities (both hard copy and electronically-stored information ("ESI")).

---

[1] Pursuant to paragraph 50 of Section XIII of the Appointment Order, I was required to obtain permission from this Court to retain legal counsel. On July 10, 2019, I filed a Motion to Employ Sallah Astarita & Cox, LLC (the "Sallah Firm") and Silver Law Group (the "Silver Firm") as my legal counsel [DE 101]. The Motion to Employ was resolved by Agreed Order [DE 126].

Throughout this process, my professionals and I have worked cooperatively with the SEC and other agencies, with each side mindful of their respective responsibilities and duties. The coordination of my and the SEC's efforts has resulted in many accomplishments (further discussed below) for the benefit of the Receivership Estate and victimized investors.

**2. Demands on, and Meetings with, Aman and the Seigels**

As previously reported, I made various demands on and had several meetings with Aman, the Seigels and their counsel in April through June of this year. I will not repeat the same summaries in this Report. During the last quarter through September, I continued to make informal demands on both Aman and the Seigels when necessary regarding various receivership issues, including among other things: (i) the present location of diamonds, including those owned by investors or clients of the Seigels (discussed further below); (ii) the location of investor funds; (iii) an explanation and accounting of what happened to the purported $30 million that was raised from the investors; (iv) the list of all investors, with contact information and their investment history; (v) the identification of investors who received money back; (vi) the nature and explanation of the NDIC business and investments; (vii) the nature and explanation of the EFDG business and investments; and (viii) the nature and explanation of the Argyle business and investments. Aman and the Seigels have been cooperative, have met with me when requested to do so, and have answered (through counsel) my questions.

As reported previously, I have also received hard copy files of dozens of boxes of documents and the corporate computer's CPU from the former business premises. My review of the hard copy and electronic files is continuing.

**3. The Business**

As previously reported, there is no operating business for the Receivership Entities. All company bank accounts were depleted and closed as of my appointment. The Receivership

Entities' websites remain shut down.  I have instructed Aman and the Seigels that they cannot continue the diamond and cryptocurrency investments they previously did through the Receivership Entities.

### 4.  Subpoenas

As previously reported, I listed the various initial subpoenas to third parties to discover information about assets and the use of investor funds.  I have received and will continue to receive subpoena productions.  I will also continue to subpoena additional third parties throughout this proceeding.

### 5.  Additional Demands

As previously reported, I served several demand letters on non-parties who received (or may have received) money or assets that are or may be subject to the Appointment Order and may be required to return those items.  Some have responded and some have not.  Some have returned diamonds and jewelry, while others have not.  I will continue to not name their names, as I do not want to disclose whom I may or will be suing, or filing turnover motions against, for the benefit of the Receivership Estate.

### 6.  The Business Premises

I previously reported that I inspected the former business premises located at 125 Worth Avenue, Suite 203, Palm Beach, Florida 33480; removed the remaining furniture, fixtures, and equipment within; secured the books and records within; signed a cancellation of lease and limited release with the landlord (in which the lease was formally cancelled and I was released of any obligation to continue to pay rent); and filed a motion to sell the furniture, fixtures, and equipment [DE 41, 42 in the Corporate Monitor Action].

There were not that many office items to sell.  Unfortunately, they were not too valuable, according to the preliminary assessments by the auctioneer, who at first did not even want the

items.  I ultimately sold the various office items through my own efforts for a total amount of $2,555.00 without having to incur any storage expenses.  The sales proceeds have been deposited in the EFDG/NDIC receivership account because the lease was in EFDG's name.

### 7.  Other Pending Lawsuits

There have been many pending lawsuits against the Receivership Entities, the Seigels, and/or Aman.  I have continued to contact the lawyers in the known pending cases to inform them of the Corporate Monitor Appointment Order, the Appointment Order in this case, and have filed the Appointment Orders in the other lawsuits to request a stay of the other lawsuits (if not already stayed by the parties and/or the Courts *sua sponte*).  Importantly, the Appointment Order in Section VII, paragraphs 27-29, prohibits any investor, creditor or other third party from suing the Receivership Entities or executing on their assets.   All known pending claims against the Receivership Entities in the other lawsuits have been stayed, although the personal claims against Aman and/or the Seigels in several lawsuits remain pending.  I also continue to reserve all rights to bring the stay issue before this Court, if necessary.

### 8.  Receivership Appraiser

I recently moved to employ, which this Court promptly granted, a respected local diamond/jewelry appraiser to appraise the various diamonds that I secured [DE 139, 140].  The Appraiser has concluded his appraisal of (i) the 104 pouches of rough colored purported diamonds; and (ii) the engagement ring that Aman gave to his fiancée.

As previously reported, I secured many different types of diamonds for the benefit of the Receivership Estate.  For example, as discussed below, Aman was previously holding countless purported rough diamonds in 104 separate pouches that he promptly turned over to me at the first proffer session in April 2019.  The diamonds are uncut, unpolished and, therefore, in what is colloquially referred to as a "rough" state.

The 104 pouches of rough diamonds are located in my safe deposit box that I opened for purposes of this case. The diamonds have also been inventoried, the inventory of which was attached as Exhibit B to my First Quarterly Status Report.

I needed to confirm whether the rough diamonds are, in fact, actual diamonds; their value in their current rough state; and whether any of the rough diamonds can be "cut."[2] In addition, I intend to request that Relief Defendant G7 make the various diamonds and jewelry at issue in this case in its possession available for appraisal by my requested appraiser. Therefore, I needed to employ a diamond appraiser for purposes of assisting me with these diamond-related issues.

I requested to employ Jewelry by Frank Inc. Appraisal Service as my receivership diamond/jewelry appraiser to assist me with the above diamond and jewelry issues, as well as any other diamond and jewelry issues that may arise in the receivership. Jewelry by Frank Inc. Appraisal Service, including its principal Frank Graziano, is a longtime, respected diamond/jewelry appraiser in South Florida. The company also has experience with rough, colored diamonds (like the ones in this case), including the equipment to authenticate and appraise same.

Jewelry by Frank Inc. Appraisal Service is familiar with the diamonds in the receivership because Mr. Graziano previously appraised a large amount of the inventory of the diamonds of the Receivership Entities before the Receiver's appointment. That prior experience and familiarity with the diamonds should benefit the Estate, including potentially saving expenses associated with appraising the many diamonds and jewelry pieces currently secured.

Jewelry by Frank Inc. Appraisal Service has worked for many years with the Federal Government, including the Department of Homeland Security and various federal agencies such as the Internal Revenue Service, Customs and Border Protection, and the Secret Service, regarding

---

[2] Nothing, of course, will occur without first having apprised the Court and obtaining Court-approval.

appraising seized diamonds and jewelry subject to federal proceedings.  Mr. Graziano has also been an expert witness in federal proceedings in Florida and Georgia.

Mr. Graziano's standard hourly billing rate is $150.00.  I filed a Motion to Employ, which this Court promptly granted [DE 139, 140], to apprise the parties of Jewelry by Frank Inc. Appraisal Service's requested employment and to seek authorization to do so, pursuant to paragraph 50 of Section XIII of the Appointment Order.  However, Jewelry by Frank Inc. Appraisal Service's diamond and jewelry related services are in the nature of administrative expenses and are not in the nature of legal or accounting services, so I will be compensating the company pursuant to paragraph 49 of Section XIII of the Appointment Order, which provides that I can pay expenses without Court-approval "for expenses in the ordinary course of the administration and operation of the receivership."

As stated above, and as further discussed below, the appraisal is partially completed.

**B.  The Amount of Cash on Hand, the Amount and Nature of Accrued Administrative Expenses and the Amount of Unencumbered Funds in the Estate**

There are still no funds in the Argyle receivership bank account.  Again, there were no funds remaining in Argyle's bank accounts as of my appointment.

As previously reported, I established an NDIC and EFDG receivership bank account in early April 2019 to deposit and safeguard their funds in connection with the Corporate Monitor Action.  As of September 30, 2019, there was **$235,563.23** in the EFDG/NDIC receivership account.  That account was not funded, however, from any funds remaining in the EFDG/NDIC accounts; again, there were no funds remaining in those accounts as of my appointment.

Instead, as reported previously, the plaintiffs in the Corporate Monitor Action agreed to transfer **$100,000.00** that they recovered to initially fund the account for the benefit of the Receivership Estate.  The $100,000.00 they obtained was from a recent transfer by Aman and EFDG to the plaintiffs in February 2019 in direct response to the filing of the Motion seeking my

appointment as Corporate Monitor [DE 25 in the Corporate Monitor Action].  The EFDG/NDIC receivership account had decreased from the initial funding of $100,000.00 as a result of administrative expenses associated with caring for, maintaining, and appraising four jumping horses (further discussed in Section D.2, *infra*) that I had seized as Corporate Monitor in late April 2019 in the Corporate Monitor Action.

The EFDG/NDIC receivership account was then increased by **$164,000.00** in net closing proceeds as a result of my efforts selling four horses that I secured.  The four horses sold for a total of $175,500.00, but there was a 10% broker's commission for one of the horses ($11,500.00).  The sales proceeds are a result of this Court's granting my two separate motions to approve the sales of the four horses [DE 105, 106, 135, 138, and 141].  The sales proceeds have been deposited in the EFDG/NDIC receivership account because that account funded the expenses associated with caring for, maintaining, and appraising the four horses.  The horses' sales had the impact of both monetizing those assets and eliminating the monthly expense of maintaining them.

**C. A Schedule of All the Receiver's Receipts and Disbursements (Attached as Exhibit A to the Quarterly Status Report), with One Column for the Quarterly Period Covered and a Second Column for the Entire Duration of the Receivership**

Attached as **Exhibit A** is the required schedule of my receipts and disbursements during the subject quarterly period.  The attached schedule reflects a "zero balance" for the Argyle receivership account and a balance of $235,563.23 for the EFDG/NDIC receivership account.

**D. A Description of All Known Receivership Property, Including Approximate or Actual Valuations, Anticipated or Proposed Dispositions, and Reasons for Retaining Assets Where No Disposition Is Intended**

**1. The Diamonds**

Shortly after my appointment as Corporate Monitor, I learned that several people and companies were holding diamonds owned by EFDG/NDIC and/or swept into the underlying

EFDG/NDIC scheme.  I discuss what I received, from whom, and the current the disposition of those assets below.

### a.  Aman

As reported above, I have obtained an appraisal for the 104 pouches of uncut, unpolished colored diamonds that I obtained from Aman after I was appointed.  The inventory of the 104 pouches of rough diamonds was attached as Exhibit B to my First Report.  I have also obtained an appraisal for Aman's fiancée's engagement ring.  I will be appraising additional jewelry pieces that Aman turned over to me.  All of the items are also located in my safe deposit box and will ultimately be sold through a Court-approved motion for the benefit of the Receivership Estate.

### b.  Harold Seigel

As previously reported, Harold Seigel was holding two cut yellow diamonds of 1.27 and 2.37 carats.  Shortly after my appointment as Corporate Monitor, I learned that these two diamonds had been provided by Aman to Seigel's counsel (in the Corporate Monitor Action) as potential security for the payment of legal bills.  The transaction was documented through a memorandum of the d/b/a for EFDG, Diamante Atelier.  The diamonds had been returned by Seigel's counsel to Seigel through Aman's sister almost immediately before EFDG's/NDIC's decision to stipulate to my appointment as Corporate Monitor in the Corporate Monitor Action.  I was not initially advised by the Seigels or their then counsel of these diamonds or this transfer (which, again, immediately preceded my appointment).  When I learned about it, given these circumstances, I demanded that the two diamonds be turned over to me.  The next day, Harold Seigel delivered the two diamonds to me with GIA certificates.  The diamonds are located in my safe deposit box and have been inventoried.  The inventory was previously attached as Exhibit D to my First Report.

### c. Investors

Certain investors had been holding diamonds and/or jewelry owned by EFDG/NDIC. My understanding is that Aman gave such items to certain investors to hold as a sign of good faith for making future payments under the investment contracts. I sent the investors a demand letter requesting immediate turnover of the diamonds or jewelry to me. One investor returned the diamonds/jewelry; however, others are still considering my demand, have ignored my demand, or have informed me that they have already sold the diamonds prior to my appointment. The acknowledgement of receipt/list of investor-returned diamonds was previously attached as Exhibit E to my First Report.

These diamonds are also located in my safe deposit box, have been inventoried, and will be appraised and sold through a Court-approved motion for the benefit of the Receivership Estate.

If an investor ultimately refuses to return any diamonds/jewelry to me, I will evaluate filing a turnover motion. In addition to a turnover motion, I also intend to recommend denying their potential claim in the anticipated future claims procedure. At this time, I am continuing to not name these investors, as I do not want to disclose the identities of potential targets.

I anticipate that I will continue to learn new names of investors who received and/or are holding diamonds/jewelry as this proceeding continues. I have also demanded that Aman and the Seigels provide me with a full written accounting of all investors who previously received and/or are holding diamonds/jewelry so I can send them a demand for their immediate turnover.

### d. Vendors

Like investors, vendors such as the landlord for the Receivership Entities' business premises, 125 Worth Partners LLC, had been holding diamonds owned by EFDG/NDIC. My understanding is that, just like certain investors, Aman gave diamonds to the landlord to hold as a sign of good faith for making future rent payments. I sent the landlord a series of demand emails

requesting immediate turnover to me. The landlord complied and turned over five diamonds to me. The diamonds are located in my safe deposit box, have been inventoried, and will also be sold through a Court-approved motion for the benefit of the Receivership Estate. The acknowledgement of receipt/list was previously attached as Exhibit F to my First Report.

There are additional vendors that had diamonds from EFDG/NDIC. For example, one of the companies that sold rough diamonds to EFDG/NDIC is the American Institute of Diamond Cutting, Inc. In addition, there were other transactions with that company, including consignments of diamonds and jewelry. I sent a demand letter to the American Institute of Diamond Cutting, Inc., which responded that it had three diamonds to turn over. The American Institute of Diamond Cutting, Inc. complied and turned over the three diamonds to me.[3]

These diamonds are located in my safe deposit box, have been inventoried, and will also be appraised. The acknowledgement of receipt/list was previously attached as Exhibit G to my First Report.

### e. Non-Party Carmelo De Stefano

I learned that non-party Carmelo De Stefano likely had many diamonds or pieces of jewelry that derived from the Receivership Entities. Mr. De Stefano was Aman's friend, was an Argyle employee, and was a business partner with Aman involving a Diamante Atelier business venture.

I sent Mr. De Stefano a demand letter, negotiated, and ultimately obtained possession of 38 pieces of jewelry and diamonds from Mr. De Stefano pursuant to an Agreed Order [DE 73]. A portion of the diamonds were previously appraised before the receivership for more than $200,000. The diamonds are located in my safe deposit box and have been inventoried. The acknowledgement of receipt/list was previously attached as Exhibit H to my First Report.

---

[3] I will also be seeking an accounting of all diamond transactions between the Receivership Entities and the American Institute of Diamond Cutting, Inc.

On September 27, 2019 and October 23, 2019, I met with Mr. De Stefano and his counsel to discuss the jewelry/diamonds he previously turned over and other relevant issues. Mr. De Stefano has been cooperative. I am trying to obtain his agreement to relinquish any interest he may claim to the diamonds/jewelry for the benefit of the Receivership Estate, absent which I will have no choice but to file a motion and/or an action against him.

### f. Local Diamond Stores/Pawn Shops

Shortly after my appointment as Corporate Monitor, Aman disclosed to me that there were two local jewelry stores (or pawn shops) that had recently received valuable diamonds owned by EFDG/NDIC. My summaries of the transactions, and the current state of affairs with respect to each, is set forth below.

### i. G7

The first store was G7, which is located near the Seybold Building in Downtown Miami. G7 is a Relief Defendant in this case.

According to Aman, shortly before my appointment as Corporate Monitor, he consigned dozens of diamonds and a few jewelry pieces to G7 in loan transactions and received $930,000 at 3% interest with the diamonds/jewelry as collateral. The diamonds/jewelry are owned by the Receivership Entities and/or their customers who had previously given their diamonds to Aman or the Seigels for marketing for sale or recertifying through GIA.

I immediately served the Appointment Order (from the Corporate Monitor Action) on G7 and demanded that no diamonds/jewelry be sold, transferred, or conveyed. G7 disputed this and claimed that the subject diamonds/jewelry were not covered by the Corporate Monitor Appointment Order because Aman, not EFDG/NDIC, owned and sold the diamonds and because G7 purchased the diamonds from Aman for fair value.

I repeatedly demanded that G7 produce all supporting documents regarding the transactions. G7, through its counsel, submitted a letter that attached purported bills of sale for the diamonds/jewelry. I then requested that G7 confirm whether it produced *all* of the documents that comprised the transactions. G7 repeatedly failed to confirm this very simple fact, but eventually agreed – after much prodding – to produce additional documents from its file. I finally received additional documents from G7, which included documents that demonstrated the transactions involved consignments and loans involving the diamonds/jewelry, not sales.

Before the SEC sued G7 as a Relief Defendant, I (as Corporate Monitor) ultimately obtained G7's consent to stand down from selling the diamonds/jewelry. Shortly thereafter, the SEC sued G7 as a Relief Defendant in this action. As part of the SEC's initial filings, I provided a declaration to the SEC regarding the dozens of diamonds/jewelry held by G7 [DE 5-12]. The SEC ultimately obtained an asset freeze over the subject diamonds/jewelry [DE 55]. I believe that the diamonds/jewelry frozen at G7 are likely worth millions of dollars. A list of the subject diamonds/jewelry that G7 has produced was attached as Exhibit I to my First Report.

One of the diamonds (a flawless blue heart diamond) on the list was sold for $430,000 before my appointment as Corporate Monitor. The $430,000 reduced Aman's loan balance from $930,000 to more than $500,000 (with interest and other expenses). In addition, the 19.5-carat fancy green rough diamond that EFDG and the Defendants represented to the many EFDG investors was worth $22 million, upon cutting and polishing, is one of the many diamonds at G7 covered by the asset freeze. G7 has represented to me in writing that it believes that diamond "is worth so little money" and is "basically worthless."

On October 7, 2019, G7 served voluminous written discovery on me, including a first request for production, first set of interrogatories and first request for admissions. I will further discuss this G7 discovery in my next report.

### ii.      Provident Jewelry

Like G7, Provident Jewelry, namely the 331 Clematis Street store, received some diamonds in a similar fashion.  I (as Corporate Monitor) sent an immediate demand to maintain the status quo of the various diamonds and jewelry pieces that Provident Jewelry received from a recent transaction at the 331 Clematis St. store.  Provident Jewelry ignored my initial demand email as well as my follow-up letter.  Therefore, I will be taking the necessary actions against that company.

### 2.  The Horses

As previously reported, I seized four jumping horses in connection with the Corporate Monitor Action and before the filing of this action whose care and management were funded by primarily EFDG (and thus investors) before my appointment.  I relocated the horses to a new facility, continued to care for them through the EFDG/NDIC bank account, marketed them for sale, and ultimately signed three purchase agreements to sell all four horses for a total of $175,500, the funds of which I have received and deposited in the EFDG/NDIC account (that account funded the care, maintenance, and appraisals for the horses).  I filed two motions to approve the horses' sales (one motion when two purchase agreements were signed, and one motion in a self-executing manner before the third and final purchase agreement (for the two remaining horses) was signed), which this Court promptly granted [DE 105, 106, 135, 138, and 141].

### 3.  Argyle's Technology

I provided notice of the Appointment Order to certain vendors including Ideofuzion, a Pakistani company and the developer of Argyle's cryptocurrency technology, blockchain, and code.  I will be investigating and evaluating whether Argyle's cryptocurrency technology has any value, and if so, how much and how best to sell it.

Case No. 9:19-CV-80633-ROSENBERG

### 4. The Receivership Entities' Bank Accounts

The Receivership Entities maintained bank accounts at Bank of America.  Again, there were no funds in the Receivership Entities' accounts as of my appointment.

I have performed, and continue to perform, a preliminary review of the bank records. Aman drained the corporate accounts to ensure there was a zero balance at the time of my appointment as Corporate Monitor and had spent many years living a very lavish lifestyle.  It also appears that Aman transferred significant funds to others, including, but not limited to, the Seigels (through their company Relief Defendant H.S. Management Group LLC) and Relief Defendant Winners Church and its pastor/bishop (Relief Defendants, the Shipmans).  It appears that there were many transactions that I believe are subject to clawback, especially in the months leading up to my appointment as Corporate Monitor and no different than the 90-day preference period afforded to trustees in bankruptcy cases.  Therefore, I will be investigating potential targets for purposes of ancillary receivership litigation for the benefit of the Receivership Estate.

In addition to Bank of America, I learned that the Receivership Entities may have had prior accounts at BB&T Bank and PNC Bank.  Like Bank of America, I served BB&T and PNC Banks with the Corporate Monitor Appointment Order and instructed them to freeze the company accounts.  Although there were no accounts or funds identified in the accounts at BB&T and/or PNC Banks, BB&T Bank froze $1,350.51 in the name of related entity (Fancy Diamonds Private Investments LLC.)  At my request, BB&T has agreed to transfer these funds to me, which I expect to receive shortly.

### 5. The Office Items

As stated above, I removed the remaining office items/personalty from the former business premises and have sold the various office items for $2,555, given the minimal liquidation value of each item.

In addition, there were 44 coins in one of the safes at the former business premises that I have secured.  I am attempting to determine who owns the coins and ultimately whether they are subject to this proceeding.  The coins are not part of any of the relief requested in any motion previously filed in this proceeding or the Corporate Monitor Action.

### 6. Diamonds Owned by Investors and Other Seigel Clients

After my appointment as Receiver, I learned the names of several people, including investors and Seigel clients, who have asked me whether I have secured their diamonds.  It appears that several diamonds purportedly owned by at least four investors or Seigel clients are currently being held by G7.  It also appears that certain nonparties, such as the above-mentioned American Institute of Diamonds Cutting, was holding at least one diamond purportedly owned by one investor/Seigel client.  That specific diamond has been turned over to me by the American Institute of Diamond Cutting.

I have also communicated with several people who have represented to me that (i) they had purchased diamonds from the Seigels/their companies and (ii) thereafter the Seigels stored the diamonds in their safe, typically for purposes of a future auction or resale.  Those investors/customers have asked me whether I have secured their diamonds.  I have GIA reports of the cut/polished diamonds that I have secured and have the ability to check my inventory if the investor/customer provides the GIA number of his/her diamond.  I have identified at least three diamonds that I have secured in that manner.  For the diamonds that I do not have, I have asked the Seigels to account for the location of each diamond that is the subject of the investor/customer's inquiry.  That process is ongoing, and I will continue to report on same in the future.

**E. A Description of Liquidated and Unliquidated Claims Held by the Receivership Estate, Including the Need for Forensic and/or Investigatory Resources; Approximate Valuations of Claims; and Anticipated or Proposed Methods of Enforcing Such Claims (Including Likelihood of Success in: (i) Reducing the Claims to Judgment; and, (ii) Collecting Such Judgments)**

Because the receivership recently commenced, it is still premature to discuss the specific claims that I may bring as Receiver.  However, and as stated previously, whatever claims that I ultimately bring will be with the  hopes, and a probability, of winning and collecting.  I remain very mindful and sensitive of the issue of expenses and the necessity for efficiency and limiting expenses as much as possible in every aspect of this proceeding, including investigating and filing ancillary lawsuits for additional recoveries to benefit the Receivership Estate.  I intend to continue to make every decision with a cost-benefit analysis of the amount needed to bring and prosecute the claim versus the potential recovery.

Regarding the issue of forensic investigations, I have received many of the companies' bank records from Bank of America for the period of 2014 through 2019.  As stated above, there were no funds in the accounts as of my appointment.  The dissipation and transfers occurred over many years.  There are literally thousands of transactions to reconstruct, including those that are legitimate and many that are undoubtedly illegitimate.  Assuming there are sufficient funds to perform the necessary forensic work, I anticipate retaining an accounting firm to fully reconstruct the Receivership Entities' bank accounts and other relevant accounts.

I intend to determine what each investor is owed (net investment amount of money in and money out), as well as everyone who improperly received funds or otherwise profited from the Receivership Entities' investment scheme.  I anticipate there will be many people and many entities who profited or improperly received funds.  I intend to serve pre-suit demand letters on identified targets, which may result in ancillary lawsuits.  I will continue to not identify those targets in this Report.

### F. A List of All Known Creditors with Their Addresses and the Amounts of Their Claims

It appears that the Receivership Entities had hundreds of investors. I am still in the process of quantifying the actual number of investors. It also appears that the Receivership Entities raised approximately $30 million. I am also still in the process of calculating the actual amount of money raised. The amount of the investors'/creditors' claims, as well as my recommended treatment of such, will be part of the future claims procedure and claims proceedings (see section G, *infra*).

When the Corporate Monitor Action began, I (as Corporate Monitor) obtained investor lists from Aman. However, the lists do not include what each investor has been repaid and do not include all of the investors' names. I have been, and will continue to be, in constant contact with the investors. I will also be compiling my own investor list, including names and contact information, to ensure I know the universe of investors, the amounts they invested, and the amounts they received back, whether denominated as "interest" or "principal."

Regarding the receivership website (naturaldiamondsreceivership.com), I continue to update it with important court filings and investor letters. For example, I recently uploaded to the website a new investor letter dated October 11, 2019, a copy of which is attached as **Exhibit B**.

The receivership website also contains a registration form,[4] a "frequently asked questions" section to educate the investors about the receivership process, and an email address (naturaldiamondsreceivership@lklsg.com) and phone number (786.347.2563), so the investors may contact me directly with questions that were not answered by navigating the website. My staff, professionals, and I regularly communicate with investors.

---

[4] The registration form is a helpful tool for investors and creditors to send me their name, contact information, and an estimate of the amount of money they believe they are owed.

Case No. 9:19-CV-80633-ROSENBERG

**G. The Status of Creditor Claims Proceedings, after Such Proceedings Have Been Commenced**

Because the receivership recently commenced, it is still premature to discuss the specifics of a claims procedure and claims proceedings, or when the claims procedure and claims proceedings will begin and conclude.  However, it remains my goal to develop a claims procedure and conclude claims proceedings as soon as possible with as little claims litigation as possible and ultimately repay all legitimate investor and creditor claims as soon as possible.

**H. The Receiver's Recommendations for a Continuation or Discontinuation of the Receivership and the Reason for the Recommendations**

Because the receivership recently commenced, it is still my recommendation that it should continue for the benefit of the many victimized investors, who are collectively owed tens of millions of dollars.  The underlying investment scheme has all the ingredients of a massive Ponzi scheme affecting many victims in this Country and Canada.

My overall investigation is still early and will be ongoing for some period of time.  I will supplement this Second Report with my Third Report during the next quarter (October to December 2019).

/s/ Jeffrey C. Schneider
Jeffrey C. Schneider, not individually,
but solely in my capacity as Receiver

Dated: October 30, 2019

# EXHIBIT A

STANDARDIZED FUND ACCOUNTING REPORT FOR
SECURITIES AND EXCHANGE COMMISSION
VS.
NATURAL DIAMONDS INVESTMENT CO., et al.
CASE NO.: 19-CV-80633-ROSENBERG
For the period July 1, 2019 through September 30, 2019

| Fund Accounting | | | | Detail | Subtotal |
|---|---|---|---|---|---|
| Line 1 | Beginning Balance | | | NDIC Checking (Acct 7414)  (Corporate Monitor Account ) | |
| | | | | | $100,000.00 |
| | | | | SEC v. Argyle Checking (Acct 8373) | $0.00 |
| **TOTAL CURRENT ASSETS** | | | | | **$100,000.00** |
| Line 2 | Business Income | 7/23/2019 | | Sale of Horses | $168,000.00 |
| | | 9/16/2019 | | Sale of Office Furniture and Equipment | $2,555.00 |
| **TOTAL INCOME** | | | | | **$170,555.00** |
| Line 3 | Cash and Securities | | | | $0.00 |
| **TOTAL NDIC CHECKING (Acct 7414)** | | | | | **$270,555.00** |
| Line 4 | Interest/Dividend Income | | | | $0.00 |
| **TOTAL INTEREST/ DIVIDEND INCOME** | | | | | **$0.00** |
| | Business Asset Liquidation | | | | $0.00 |
| | Personal Asset Liquidation | | | | $0.00 |
| Line 5 | Third-Party Litigation Income | | | | $0.00 |
| Line 6 | Miscellaneous - Other | | | | $0.00 |
| Line 7 | **TOTAL FUNDS (Lines 1-7)** | | | | **$270,555.00** |

| | | | | |
|---|---|---|---|---|
| Line 8 | (Decrease) in Fund Balance)<br>RECEIVERSHIP EXPENSES | | | |
| | | 5/31/2019 | Benchmark Equestrian (Transporting Horses Seized from Jose Aman) | $600.00 |
| | | 5/31/2019 | Benchmark Equestrian (Boarding Horses) | $4,875.00 |
| | | 5/31/2019 | Bob Parbus (Horse Maintenance) | $600.00 |
| | | 6/14/2019 | Bank Service Charge (Receivership Safe Deposit Box) | $200.00 |
| | | 6/28/2019 | Innovative Properties (Equine Appraisal Fee) | $1,600.00 |
| | | 6/28/2019 | WM Russ Walther (Equine Appraisal Fee) | $1,000.00 |
| | | 7/2/2019 | Bob Parbus (Horse Maintenance) | $710.00 |
| | | 7/16/2019 | Benchmark Equestrian (Boarding of Horses and Medical Expenses) | $5,000.00 |
| | | 7/16/2019 | Benchmark Equestrian (Invoice 80 - Boarding Horses) | $4,800.00 |
| | | 7/16/2019 | Rudley Blackwood (Clean receivership Office) | $250.00 |
| | | 8/2/2019 | Benchmark Equestrian (Commission Sale of Horses) | $11,500.00 |
| | | 8/26/2019 | Benchmark Equestrian (Boarding Horses) | $2,400.00 |
| | | 8/26/2019 | Steve Bosson Movers | $1,256.77 |
| | | 8/26/2019 | Bob Parbus (Horse Maintenance) | $200.00 |
| | TOTAL BUSINESS EXPENSES (Line B) | | | **$34,991.77** |
| | Disbursements to Investors | | | $0.00 |
| | Disbursements to Receivership Operations | | | $0.00 |
| Line 9 | Disbursements to Receiver or Other Professionals | | | $0.00 |
| Line 10b | | | | |
| | Personal Asset Expenses | | | $0.00 |
| | Investment Expenses | | | $0.00 |
| | Third-Party Litigation Expenses | | | |
| Line 10c | 1. Attorneys Fees | | | $0.00 |
| Line 10d | 2. Litigation Expenses | | | $0.00 |
| Line 10e | Tax Administrator Fees and Bonds | | | $0.00 |
| Total Third-Party Litigation Expenses | Federal and State Tax Payments | | | $0.00 |
| Line 10f | TOTAL DISBURSEMENTS FOR RECEIVERSHIP OPERATIONS | | | $0.00 |
| Line 10g | Disbursements for Distribution Expenses Paid by the Fund: | | | $0.00 |
| | Distribution Plan Development Expenses | | | $0.00 |
| Line 11 | Fees: | | | $0.00 |



| | | | | |
|---|---|---|---|---|
| Line 11a | Fund Administrator | | | $0.00 |
| | Independent Distribution Consultant (IDC) | | | $0.00 |
| | Distribution Agent | | | $0.00 |
| | Consultants | | | $0.00 |
| | Legal Advisers | | | $0.00 |
| | Tax Advisers | | | $0.00 |
| | 2. Administrative Expenses | | | $0.00 |
| | 3. Miscellaneous | | | $0.00 |
| | Total Plan Development Expenses | | | $0.00 |
| | Distribution Plan Development Expenses | | | $0.00 |
| | 1. Fees: | | | $0.00 |
| Line 11b | Fund Administrator | | | $0.00 |
| | Independent Distribution Consultant (IDC) | | | $0.00 |
| | Distribution Agent | | | $0.00 |
| | Consultants | | | $0.00 |
| | Legal Advisers | | | $0.00 |
| | Tax Advisers | | | $0.00 |
| | 2. Administrative Expenses | | | $0.00 |
| | 3. Investor Identification: | | | $0.00 |
| | Notice/Publishing Approved Plan | | | $0.00 |
| | Claimant Identification | | | $0.00 |
| | Claims Processing | | | $0.00 |
| | Web Site Maintenance | | | $0.00 |
| | 4. Fund Administrator Bond | | | $0.00 |
| | 5. Miscellaneous | | | $0.00 |
| | 6. Federal Account for Investor Restitution (FAIR) Reporting Expenses | | | $0.00 |
| | *Total Plan Implentation Expenses* | | | $0.00 |
| | Total Disbursements for Distribution Expenses Paid by the Fund | | | $0.00 |
| | Disbursements to Court/Other | | | $0.00 |
| | Investment Expenses/Court Registry Investment System (CRIS) Fees | | | $0.00 |
| Line 12 | Federal Tax Payments | | | $0.00 |
| Line 12a | Total Disbursements to Court/Other: | | | $0.00 |
| Line 12b | **TOTAL FUNDS DISBURSED (Lines 9-11)** | | | **$0.00** |
| | Cash & Cash Equivalents | | | $0.00 |
| | Investments | | | $0.00 |
| Line 13 | Other Assets or Uncleared Funds | | | $0.00 |
| Line 14 | **TOTAL ENDING BALANCE (AS OF 9/30/19)** | | | $235,563.23 |

| | | | | |
|---|---|---|---|---|
| Line 14a | Steps of Items to Add | | | |
| Line 14b | Paid by the Fund: | | | |
| Line 14c | **Disbursements for Plan Administration Expenses Not Paid by the Fund:** | | | $0.00 |
| | Plan Development Expenses Not Paid by the Fund: | | | $0.00 |
| **OTHER SUPPLEMENTAL INFORMATION:** | **1. Fees:** | | | $0.00 |
| | Fund Administrator | | | $0.00 |
| Line 15 | IDC | | | $0.00 |
| Line 15a | Distriubtion Agent | | | $0.00 |
| | Consultants | | | $0.00 |
| | Legal Advisers | | | $0.00 |
| | Tax Advisers | | | $0.00 |
| | **2. Administrative Expenses** | | | $0.00 |
| | **3. Miscellaneous** | | | $0.00 |
| | **Total Plan Development Expenses Not Paid by the Fund** | | | $0.00 |
| | Plan Implentation Expenses Not Paid by the Fund: | | | $0.00 |
| | **1. Fees:** | | | $0.00 |
| | Fund Administrator | | | $0.00 |
| | IDC | | | $0.00 |
| Line 15b | Distribution Agent | | | $0.00 |
| | Consultants | | | $0.00 |
| | Legal Advisers | | | $0.00 |
| | **2. Administrative Expenses** | | | $0.00 |
| | **3. Investor Identification:** | | | $0.00 |
| | Notice/Publishing Approved Plan | | | $0.00 |
| | Claimant Identification | | | $0.00 |
| | Claims Processing | | | $0.00 |
| | Web Site Maintenance | | | $0.00 |
| | **4. Fund Administrator Bond** | | | $0.00 |
| | **5. Miscellaneous** | | | $0.00 |
| | **6. FAIR Reporting Expenses** | | | $0.00 |
| | Tax Administrator Fees & Bonds Not Paid by the Fund | | | |
| | **Total Disbursements for Plan Administration Expenses Not Paid by the Fund** | | | $0.00 |
| | Disbursements to Court/Other Not Paid by the Fund: | | | $0.00 |
| Total Plan Implementation Expenses Not paid by the Fund | Investment Expenses/CRIS Fees | | | $0.00 |
| Line 15c | Federal Tax Payments | | | $0.00 |
| | **Total Disbursements to Court/Other Not Paid by the Fund:** | | | $0.00 |

| Line 16 | DC & State Tax Payments | | | $0.00 |
| | Details: | | | 0 |
| Line 16b | # of Claims Received this Reporting Period | | | |
| | # of Claims Received Since Inception of Fund | | | |
| Line 17 | **No. of Claimants/Investors:** | | | |
| Line 18 | # of Claimants/Investors Paid this Reporting Period | 0 | | |
| | | | | $0.00 |
| Line 18a | # of Claimants/Investors Paid Since Inception of Fund | 0 | | |
| | | | | $0.00 |
| Line 18b | | | | |
| Line 19 | | | | |
| Line 19a | | | | |
| Line 19b | | | | |
| Receiver | | | | |
| By: | | | | |
| | Jeffrey Schneider, Court-Appointed Receiver | | | |
| Printed Name | | | | |
| Date: October 25, 2019 | | | | |

# EXHIBIT B

JEFFREY C. SCHNEIDER, Receiver
Citigroup Center
201 S. Biscayne Boulevard, 22nd Floor
Miami, FL 33131
Email:  naturaldiamondsreceivership@lklsg.com
Website:  www.naturaldiamondsreceivership.com

October 11, 2019

**VIA WEB POSTING**

Re:  ***Securities and Exchange Commission v. Natural Diamonds Investment Co., et al.***
**United States District Court Southern District of Florida**
**Case No. 19-CV-80633-ROSENBERG**

Dear Investors:

In my earlier letter, I wrote to you as the court-appointed Receiver for Argyle Coin and the court-appointed Corporate Monitor for Natural Diamonds Investment and Eagle Financial Diamond Group.  Since that time, the SEC receivership has been expanded to include Natural Diamonds and Eagle Financial and I am in the process of seeking an order closing the Corporate Monitor case.  I am doing this to minimize the expense of having two proceedings pending at the same time before two different judges in which I am basically performing the same court-ordered functions.

As I mentioned in my last letter to you and in the reports I filed with the Court, since being appointed, I have collected $100,000, over 150 diamonds (104 of which are discussed specifically below), 4 jumping horses, and several pieces of jewelry.  There were no other funds in any of the companies' bank accounts.

All of the diamonds and jewelry that I secured are contained in a safe deposit box and are protected.  The horses were also protected and being maintained.  I have since sold the horses for approximately $175,000, which had the impact of both monetizing those assets and eliminating the monthly expense of maintaining them.

I have also begun the process of having the 104 uncut, unpolished colored diamonds appraised.  As you may have read in my previous reports, I obtained 104 pouches of rough, uncut colored diamonds from Jose Aman shortly after I was appointed.  The appraiser has already inspected each one and is in the process of finalizing his appraisal.  I hope to have that appraisal in the next few weeks.    You  can  check  the  website  for  further  details:  www.naturaldiamondsreceivership.com.

I have secured several other pieces of jewelry and diamonds from third parties.  This includes several large, cut yellow diamonds.  All of these items are in my possession and are going to be appraised soon.

I also secured possession of the entities' former retail space on Worth Avenue in Palm Beach. I cancelled the lease in order to eliminate the continuing monthly expense and obtained a release from the landlord. I secured the furniture, fixtures and equipment that were in the space and sold those items. Unfortunately, there was nothing on site that was too valuable.

I have served subpoenas on countless third parties that may have received assets from Aman or the Receivership Entities. I also served subpoenas on several banks where Aman or the Receivership Entities maintained accounts, such as Bank of America, BB&T, PNC Bank. I also served subpoenas on American Express and the Receivership Entities' former attorney and accountant.

The SEC has obtained an order freezing over $1 million dollars that had been provided to a local church which is a relief defendant in the SEC's action. The SEC has also obtained an order freezing the assets that Jose Aman transferred to Gold 7 of Miami, LLC, which is also a relief defendant in the SEC's action. Gold 7 received dozens of diamonds and jewelry items from Aman, in exchange for which it transferred over $900,000 to him. The claims against those relief defendants are currently being litigated in the SEC's action. Mediation is scheduled for the first half of 2020.

Several investors have contacted me to tell about the home and property in Colorado. I am aware of the property and the SEC is aware of the property. We are researching when it was purchased, whether any funds from the Receivership Entities were transferred to it, and any other facts that might be relevant to the analysis. We will keep you posted.

Again, please check the website for additional progress in the receivership. You can also leave me messages or ask questions on the dedicated receivership number: 786-347-2563. You can also send email inquiries or comments to the dedicated email address that I created: naturaldiamondsreceivership@lklsg.com. We will try our best to return all calls and respond to all emails. We ask that you be patient and know that, when there is news to report, the receivership website will be promptly updated.

My staff and I are working diligently to secure assets and recover as much value as possible and will report on our efforts by filing periodic reports with the Court, which will also be made available on my website. The reports I filed are already posted on the website.

Thank you in advance for your cooperation and understanding.

Sincerely,

Jeffrey C. Schneider
Receiver