## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### (Palm Beach Division)

### Case No. 9:19-CV-80633-ROSENBERG

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

NATURAL DIAMONDS INVESTMENT CO.,
et al.,

     Defendants,

H.S. MANAGEMENT GROUP LLC, et al.,

     Relief Defendants.

_____/

## FOURTH QUARTERLY STATUS REPORT OF RECEIVER JEFFREY C. SCHNEIDER

Pursuant to paragraphs 46 and 47 of Section XII of the Order Granting Plaintiff Securities and Exchange Commission's Motion for Appointment of Receiver [DE 20] (the "Appointment Order"), Jeffrey C. Schneider, not individually, but solely in his capacity as the Court-appointed Receiver (the "Receiver") for Natural Diamonds Investment Co. ("NDIC"), Eagle Financial Diamond Group, Inc. ("EFDG"), and Argyle Coin, LLC ("Argyle") (collectively, the "Receivership Entities"), submits his Fourth Quarterly Status Report for the quarter ending March 31, 2020.

## INTRODUCTION

On May 16, 2019, this Court appointed me as Receiver for Argyle.  On March 28, 2019, approximately two months before my appointment as Receiver in this case, the Honorable Donald Middlebrooks appointed me as Corporate Monitor for NDIC and EFDG in *Rounds v. Natural Diamonds Investment Co., et al.*, Case No. 18-cv-81151 (the "Corporate Monitor Action").  I then

filed a motion requesting that this receivership be expanded to include NDIC and EFDG in order to avoid two separate proceedings and reduce expenses for the benefit of the victims of the fraud [DE 97]. On July 11, 2019, this Court granted that request and expanded the receivership to include NDIC and EFDG [DE 104]. I then moved to close the Corporate Monitor Action, so NDIC and EFDG are now part of this receivership, and the Corporate Monitor Action has been closed.

As a reminder, pursuant to paragraph 46 of the Appointment Order, I am required to file Quarterly Status Reports within 30 days of the end of each calendar quarter. The last quarter ended on March 31, 2020, so I am filing this Fourth Quarterly Status Report by the April 30th deadline.

Pursuant to paragraph 47 of the Appointment Order, the topics herein include:

A. A summary of my operations;

B. The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C. A schedule of all the receipts and disbursements (attached as Exhibit A to the Quarterly Status Report) of the receivership, with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D. A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E. A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F. A list of all known creditors with their addresses and the amounts of their claims;

G. The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

      H.  My recommendations for a continuation or discontinuation of the receivership and the reason for the recommendations.

I will continue to address these topics one-by-one below.

## A.  A Summary of the Operations of the Receiver

### 1.  Procedural Background in This Proceeding

On May 13, 2019, the Securities and Exchange Commission (the "SEC") filed an emergency action in this Court to enjoin NDIC, EFDG (a/k/a Diamante Atelier), and Argyle (again, the "Receivership Entities"), and their owners, Jose Aman, Harold Seigel and Jonathan Seigel.  In the Complaint [DE 1], the SEC asserted various claims against the Receivership Entities, Aman, and the Seigels.  Essentially, the SEC alleged that the Receivership Entities were a three-tiered Ponzi scheme that promised hundreds of investors unreasonably large investment returns that ranged from 24% to 100% every year to two years for signing investment contracts that were supposedly backed by diamonds worth tens of millions of dollars.  The SEC alleged that the Receivership Entities raised approximately $30 million from approximately 300 investors in Canada and the United States from late 2013 through the present.

The SEC also filed a Motion for Temporary Restraining Order, Asset Freeze, and Other Relief [DE 4] and a Motion for Appointment of Receiver [DE 7].  The SEC advised this Court that I had been appointed as Corporate Monitor for NDIC and EFDG in the Corporate Monitor Action, which was then also pending in the Southern District of Florida.

As a result of the SEC's efforts, this Court granted the SEC's requests and, among other things, appointed me as Receiver for Argyle.  This compelled me to, among many other things, assume full control of Argyle and to secure, conserve, hold, manage, and prevent the loss of its assets.  Similarly, given the expansion of the receivership to include NDIC and EFDG, this brought NDIC and EFDG into the fold of this case, with concomitant obligations to secure, conserve, hold, manage, and prevent the loss of NDIC's and EFDG's assets.

There are still asset freezes in place over Defendants Aman, Harold Seigel and H.S. Management Group LLC, which is a Seigel entity that received millions of dollars from the Receivership Entities and a current relief defendant in this action [DE 40].  In addition, there are asset freezes over the other relief defendants, including approximately $2.1 million frozen in accounts in the names of Relief Defendants Winners Church International Inc. of West Palm Beach Florida ("Winners Church") and Fredrick and Whitney Shipman (collectively, the "Shipmans") [DE 59], and dozens of diamonds and jewelry pieces held by Relief Defendant Gold 7 of Miami, LLC ("G7") [DE 55].  Regarding Winners Church and the Shipmans, I testified at the May 23, 2019 show cause hearing, after which there were additional submissions; this Court ultimately imposed asset freezes over their assets [DE 59].  As discussed below, the SEC recently settled its claims against Winners Church and the Shipmans for the $2.1 million initially frozen and those funds will, upon Court-approval, be transferred to me to distribute, again upon Court-approval, to the victims of the fraud.

Since my appointment, my professionals and I have been working to effectuate my obligations under the Appointment Order.  As discussed more fully below, this work has primarily involved identifying and securing assets of the Receivership Entities, as well as preserving all relevant books and records regarding the Receivership Entities (both hard copy and electronically-stored information ("ESI")).

Throughout this process, my professionals and I have continued to work cooperatively with the SEC and other agencies, with each side mindful of their respective responsibilities and duties. The coordination of my and the SEC's efforts has resulted in many accomplishments (further discussed below) for the benefit of the Receivership Estate and its victims, including the recent mediation and settlement in principle between the SEC, G7 and me, which is further discussed below.

### 2.   Demands on, and Meetings with, Aman and the Seigels

I have continued to communicate with Aman's and Seigels' counsels regarding relevant receivership issues, including, among other things: (i) the present location of diamonds, including those owned by investors or clients of the Seigels (further discussed below); (ii) the location of investor funds; (iii) an explanation and accounting of what happened to the purported $30-plus million that was raised from the investors; (iv) the list of all investors, with contact information and their investment history; (v) the identification of investors who received money back; and/or (vi) the nature and explanation of the NDIC, EFDG, and Argyle businesses and investments. Aman and the Seigels have continued to be cooperative, have met with me when requested to do so, and have continued to answer (through counsel) my questions.

As reported previously, I have also received hard copy files of dozens of boxes of documents and the corporate computer's CPU from the former business premises.  My review of the hard copy and electronic files, which are voluminous, is continuing.

### 3.   The Business

As previously reported, there is no operating business for the Receivership Entities.  All company bank accounts were depleted and closed as of my appointment.  The Receivership Entities' websites remain shut down.  I have instructed Aman and the Seigels that they cannot continue the investments they previously did through the Receivership Entities.

### 4.   Subpoenas

As previously reported, I listed the various initial subpoenas to third parties to discover information about assets and the use of investor funds.  I have received the subpoena productions and intend to follow up regarding missing documents from the relevant third parties.  I have continued to serve subpoenas on additional third parties that may have information, or assets, relating to this proceeding.  The latest round of subpoenas issued during the applicable quarterly

period were to the following third parties: The Breakers (where Aman had an account), Steptoe & Johnson LLP (Argyle's initial counsel), Frost Brown Todd LLC (Argyle's initial counsel), Lexcuity PC f/k/a Homeier Law PC (Argyle's second counsel), and Bared & Associates, P.A (Argyle's alleged local legal counsel from company materials).  I have received the subpoena productions and continue to review them.  I also intend to continue to serve new subpoenas throughout this proceeding.  I will not be naming the names of upcoming to-be-subpoenaed third parties for the obvious reasons.

### 5.  Additional Demands

As a reminder, I served several demand letters on third parties who received (or may have received) money or assets that are or may be subject to the Appointment Order and may be required to return those items.  Some have responded and some have not.  Some have returned diamonds and jewelry, while others have not.  I will continue to not name their names, as I do not want to disclose whom I may or will be suing.

### 6.  The Business Premises

I previously reported that I inspected the former business premises located at 125 Worth Avenue, Suite 203, Palm Beach, Florida 33480; removed the remaining furniture, fixtures, and equipment within; secured the books and records within; signed a cancellation of lease and limited release with the landlord (in which the lease was formally cancelled and I was released of any obligation to continue to pay rent); and filed a motion to sell the furniture, fixtures, and equipment [DE 41, 42 in the Corporate Monitor Action].

There were not that many office items to sell.  Unfortunately, they were not too valuable, according to the preliminary assessments by the auctioneer, who at first did not even want the items.  I ultimately sold the various office items through my own efforts for a total amount of

$2,555.00 without having to incur any storage expenses. The sales proceeds were deposited in the EFDG/NDIC receivership account because the lease was in EFDG's name.

### 7.  Other Pending Lawsuits

There have been many pending lawsuits against the Receivership Entities, the Seigels, and/or Aman. I have continued to contact the lawyers in the known pending cases to inform them of the Appointment Order and to request a stay of the other lawsuits (if not already stayed by the parties and/or the Courts *sua sponte*). Importantly, the Appointment Order in Section VII, paragraphs 27-29, prohibits anyone from suing the Receivership Entities or executing on their assets. All known pending claims against the Receivership Entities in the other lawsuits have been stayed, although the personal claims against Aman and/or the Seigels in several lawsuits remain pending. I also continue to reserve all rights to bring the stay issue before this Court, if necessary.

### 8.  Receivership Appraiser

As previously reported, Jewelry by Frank Inc. Appraisal Service (principal Frank Graziano) (the "Appraiser" or "Jewelry by Frank") is familiar with the diamonds in the receivership because Mr. Graziano previously appraised a large amount of the inventory of the diamonds of the Receivership Entities before my appointment. That prior experience and familiarity with the diamonds benefitted the Estate, including by saving expenses associated with appraising the many diamonds I secured. As also previously reported, the Appraiser has concluded his appraisal of (i) the 104 pouches of rough colored diamonds that Aman turned over to me when this proceeding began; and (ii) Aman's fiancée's engagement ring that Aman also turned over. The Appraiser has also concluded his appraisal of the 38 pieces from the Carmelo De Stefano settlement, which is further discussed below. Finally, the Appraiser did his second inspection on February 12, 2020, regarding the 51 diamonds/jewelry pieces held by G7 and has concluded his appraisal of those pieces, which is also further discussed below.

**B. The Amount of Cash on Hand, the Amount and Nature of Accrued Administrative Expenses and the Amount of Unencumbered Funds in the Estate**

As of March 31, 2020, there was **$20,546.00** in the Argyle receivership bank account. The source of these funds was the remaining retainer funds held by two law firms that previously represented Argyle. I was previously unaware of these funds and learned about them through my own investigation during the applicable quarterly period.

Specifically, Steptoe & Johnson LLP turned over $11,558.50 and Lexcuity PC turned over $8,987.50. As a reminder, there were no funds remaining in Argyle's bank accounts as of my appointment in May 2019 and there were no funds in the Argyle receivership account until the transfers to me by these two firms during the subject quarterly period.

The Argyle receivership account will be further funded in the future once I sell the above-described rough diamonds and the engagement ring, which the Court has authorized me to do [DE 168, 179]. I am currently marketing those diamonds for sale. In addition, and as discussed below, the Argyle receivership account will be further funded once I sell the jewelry recently acquired from my settlement with Mr. De Stefano, which the Court recently and promptly approved [DE 197-198].[1] In addition, and as discussed below, the Argyle receivership account will be further funded, upon Court-approval, with the approximate $2.1 million in settlement monies funded by Relief Defendants Winners Church/the Shipmans.

As previously reported, I established an NDIC and EFDG receivership bank account in early April 2019 to deposit and safeguard their funds in connection with the Corporate Monitor Action. As of March 31, 2020, there was **$54,200.70** in that account.

---

[1] I will be filing in the near future a motion for authorization to sell the 38 jewelry/diamonds from the De Stefano settlement using my discretion and on my proposed terms, similar to the previously-granted motion for authorization to sell the 104 pouches of rough diamonds and the engagement ring.

**C.  A Schedule of All the Receiver's Receipts and Disbursements (Attached as Exhibit A to the Quarterly Status Report), with One Column for the Quarterly Period Covered and a Second Column for the Entire Duration of the Receivership**

Attached as **Exhibit A** is the required schedule of my receipts and disbursements during the subject quarterly period.  The attached schedule reflects balances of $20,546.00 and $54,200.70 for the Argyle and EFDG/NDIC receivership accounts, respectively.

**D.  A Description of All Known Receivership Property, Including Approximate or Actual Valuations, Anticipated or Proposed Dispositions, and Reasons for Retaining Assets Where No Disposition Is Intended**

**1.  The Funds Deposited into the Court's Registry**

As previously reported, the SEC settled with Winners Church and the Shipmans.   The settlement was for approximately $2.1 million, which is the total amount of money that the church and its principals received from Aman and/or the Receivership Entities.  The settlement was a remarkable result by the SEC on the victims' behalves.  The settlement was memorialized in various signed and filed Consents by Winners Church and the Shipmans [DE 148-1, 149-1, 150-1], which attached proposed Final Judgments for each relief defendant.

On December 11, 2019, the Court issued Final Judgments against Winners Church and the Shipmans [DE 164-166].  The Final Judgments required Winners Church and the Shipmans to deposit specified funds into the Court's registry within certain timeframes.

On December 20, 2019 (and docketed on December 23, 2019), Winners Church and the Shipmans deposited various funds totaling $1,444,221.58 into the Court's registry [DE 170-174].  On January 2, 2020 (and docketed on January 3, 2020), Frederick Shipman deposited an additional

$229,372.06 [DE 177].[2]  Therefore, as of this filing, $1,673,593.64 in total has been deposited into the Court's registry by Winners Church and the Shipmans.

Pursuant to the Final Judgments, I am permitted to file a motion for transfer of the deposited funds to me, as Receiver, for the benefit of the Receivership Estate and its victims.  As such, I intend to file that motion as soon as the two predicates for filing that motion occur.  First, the subject funds must be deposited into the Court's registry.  As stated above, funds totaling $1,673,593.64 have already been deposited into the Court's registry.  Second, an order of disgorgement must be entered against either Eagle, Natural, Argyle, or Aman.  As of this Report, such has not occurred, but I anticipate that disgorgement orders will be forthcoming from the SEC.

### 2.  The Diamonds

Shortly after my appointment, I learned that several people and companies were holding diamonds owned by EFDG/NDIC and/or swept into the underlying EFDG/NDIC scheme.  I discuss what I received, from whom, and the current the disposition of those assets below.

#### a.  Aman

As previously reported, I obtained 104 pouches of uncut, unpolished colored diamonds from Aman shortly after I was appointed.  The inventory of the 104 pouches of rough diamonds was attached as Exhibit B to my First Report.  I also obtained Aman's fiancée's engagement ring.  All of these items have been appraised, are located in my safe deposit box, and are approved for sale to third parties using my discretion and on my terms.

I am still in the process of marketing, selling, and monetizing for the victims' benefit those diamonds and will deposit all sales proceeds in the Argyle receivership account for their benefit.

---

[2]  Additional funds will be deposited by Frederick Shipman in the future pursuant to his Final Judgment (for a total of $732,595.07).  Therefore, Winners Church and Whitney Shipman have already deposited all of the funds that they are required to deposit pursuant to the Final Judgments.

Given the worldwide pandemic of COVID-19, my efforts to market and sell these pieces (as well as additional pieces further discussed below) will likely be impaired for a period of time.  However, my understanding is that many jewelry businesses are still operating, including online and remotely.  Therefore, I am hopeful to still market and sell the pieces during these difficult times.

Although I have appraised these items, I cannot disclose the appraised values because doing such would likely lower any offers or bids I ultimately receive.  However, I can state that the rough, uncut diamonds are not worth millions of dollars in their current state.  The 104 pouches also do not contain the 19-carat rough green diamond that was the centerpiece of many Eagle investment contracts.  That diamond has been held by G7, has been subject to the Court's asset freeze, and is subject to the settlement between the SEC, G7, and me further discussed below.

### b.  Harold Seigel

As previously reported, Harold Seigel was holding two cut yellow diamonds of 1.27 and 2.37 carats.  Shortly after my appointment as Corporate Monitor, I learned that these two diamonds had been provided by Aman to Seigel's counsel (in the Corporate Monitor Action) as potential security for the payment of legal bills.  The transaction was documented through a memorandum of the d/b/a for EFDG, Diamante Atelier.  The diamonds had been returned by Seigel's counsel to Seigel through Aman's sister almost immediately before EFDG's/NDIC's decision to stipulate to my appointment as Corporate Monitor in the Corporate Monitor Action.  I was not initially advised by the Seigels or their then counsel of these diamonds or this transfer (which, again, immediately preceded my appointment).  When I learned about it, given these circumstances, I demanded that the two diamonds be turned over to me.  The next day, Mr. Seigel delivered the two diamonds to me with GIA certificates.  The diamonds are located in my safe deposit box, have been inventoried, and will be appraised.  The inventory was previously attached as Exhibit D to my First Report.

### c. Investors

Certain investors had been holding diamonds and/or jewelry owned by EFDG/NDIC. Aman gave such items to certain investors to hold as a sign of good faith for making future payments under the investment contracts.  I sent the investors a demand letter requesting immediate turnover of the diamonds or jewelry to me.  One investor returned the diamonds/jewelry; however, others ignored my demand or informed me that they have already sold the pieces prior to my appointment.  The acknowledgement of receipt/list of investor-returned diamonds was previously attached as Exhibit E to my First Report.

These diamonds are also located in my safe deposit box, have been inventoried, and will be appraised and sold through a Court-approved motion for the benefit of the Receivership Estate and its victims.

If an investor ultimately refuses to return any diamonds/jewelry to me, I will evaluate filing a turnover motion or lawsuit.  In addition to a turnover motion or lawsuit, I also intend to recommend denying their potential claim in the anticipated future claims procedure.  At this time, I am continuing to not name these investors, as I do not want to disclose potential targets.

I anticipate that I will continue to learn new names of investors who received and/or are holding diamonds/jewelry as this proceeding continues.  I also previously demanded that Aman and the Seigels provide me with a full written accounting of all investors who previously received and/or are holding diamonds/jewelry so I can send them a demand for their immediate turnover.

### d. Vendors

Like investors, vendors such as the landlord for the Receivership Entities' business premises, 125 Worth Partners LLC, had been holding diamonds owned by EFDG/NDIC.  My understanding is that, just like certain investors, Aman gave diamonds to the landlord to hold as a sign of good faith for making future rent payments.  I sent the landlord a series of demand emails

requesting immediate turnover to me.  The landlord complied and turned over five diamonds to me.  The diamonds are located in my safe deposit box, have been inventoried, and will be appraised.  The acknowledgement of receipt/list was attached as Exhibit F to my First Report.

There are additional vendors that had diamonds from EFDG/NDIC.  For example, one of the companies that sold rough diamonds to EFDG/NDIC is the American Institute of Diamond Cutting, Inc.  In addition, there were other transactions with that company, including consignments of diamonds and jewelry.  I sent a demand letter to the American Institute of Diamond Cutting, Inc., which responded that it had three diamonds to turn over.  The American Institute of Diamond Cutting, Inc. complied and turned over the three diamonds to me.[3]

These diamonds are located in my safe deposit box, have been inventoried, and will be appraised.  The acknowledgement of receipt/list was attached as Exhibit G to my First Report.

### e.  Non-Party Carmelo De Stefano

I learned that non-party Carmelo De Stefano likely had many diamonds or pieces of jewelry that derived from the Receivership Entities.  Mr. De Stefano was Aman's friend, was an Argyle employee, and was a business partner with Aman involving a Diamante Atelier business venture.

I sent Mr. De Stefano a demand letter, negotiated, and ultimately obtained possession of 38 pieces of jewelry and diamonds from Mr. De Stefano pursuant to an Agreed Order [DE 73].  The diamonds are located in my safe deposit box and have been inventoried.  The acknowledgement of receipt/list was previously attached as Exhibit H to my First Report.

On September 27, 2019 and October 23, 2019, I met with Mr. De Stefano and his counsel to discuss the 38 jewelry/diamonds he previously turned over and other relevant issues.  Mr. De Stefano has been cooperative.  During the prior quarterly period of October-December 2019, Mr.

---

[3]  I will also be seeking an accounting of all diamond transactions between the Receivership Entities and the American Institute of Diamond Cutting, Inc.

De Stefano and I came to an agreement in principle regarding a settlement of the jewelry/diamonds. During the current quarterly period, and as stated above, I filed a motion to approve the settlement agreement, which the Court promptly granted [DE 197-198].  As a result of the settlement, Mr. De Stefano has relinquished any interest in the 38 diamonds/jewelry.  I intend to file in the near future a motion to sell the subject 38 diamonds/jewelry for the benefit of the victims.  I have also appraised the diamonds/jewelry with the Appraiser, which were collectively appraised for more than $500,000.[4]

### f.  Local Diamond Stores/Pawn Shops

Shortly after my appointment as Corporate Monitor, Aman disclosed to me that there were two local jewelry stores that had recently received valuable diamonds owned by EFDG/NDIC.

### i.  G7

The first store was G7, which is located near the Seybold Building in Downtown Miami. G7 is a Relief Defendant in this case.  I re-incorporate the previously-reported information regarding G7 from my prior three reports to eliminate continued redundancy.

On October 7, 2019, G7 served voluminous written discovery on me, including a first request for production, first set of interrogatories and first request for admissions.  I served my discovery responses in mid-November.  Thereafter during the subject quarterly period, I received additional written discovery requests from G7 and responded in nearly the same manner as the initial discovery.

On January 22, 2020, Mr. Graziano inspected a majority of the diamonds/jewelry held by G7 for purposes of appraising them.  A second inspection date for the remaining diamonds occurred on February 12, 2020.  Mr. Graziano thereafter drafted and produced an appraisal for the

---

[4]  The total minimum appraisal range was previously disclosed because the matter involved a proposed settlement and therefore the settlement's consideration was properly disclosed.

51 G7 pieces.  The appraisal was essential for purposes of the G7 mediation further discussed below.

On January 23, 2020, G7's corporate representative (Yaniv Ben Hamo, G7's purported owner) sat for deposition.  The deposition did not conclude and was continued to February 7, 2020. Like the January 23rd deposition, the February 7th deposition did not conclude and was re-scheduled for March 19, 2020.  The March 19th deposition did not take place because as further discussed below, the matter ultimately settled at mediation.

Mediation between the SEC, G7, and me occurred on March 3, 2020.[5]  I was part of the mediation because G7 informed me that it would seek a release from me/the Receivership Entities for purposes of a potential global settlement with the SEC.  The matter settled and global settlement documents are currently being drafted, reviewed, revised and finalized, including (i) a consent document and final judgment between G7 and the SEC; and (ii) a motion to approve settlement agreement between G7 and me, settlement agreement between G7 and me, and proposed order granting.  The specific settlement terms will naturally not be disclosed until the various global settlement documents are fully approved and signed by the parties, and filed with the Court.

As stated above, the 19-carat green rough diamond that was represented to the many EFDG investors was worth $22 million (upon polishing and cutting) has been held by G7 and is part of the proposed G7 settlement.  My appraiser has appraised this specific diamond, along with the 50 other diamonds at G7.  The appraised value of the now-infamous 19-carat green diamond is less than $10,000.  I am disclosing this specific appraised value because this diamond was the primary centerpiece of the Ponzi scheme and the investors need to know its true value.  A recent picture of this diamond for the investors' review is attached as **Exhibit B**.

---

[5]  The Seigels did not attend mediation because the Court excused them from attending based on, in part, their representations that they could not afford it [DE 189-192].

### ii.     Provident Jewelry

Like G7, Provident Jewelry, namely the 331 Clematis Street store, received some diamonds in a similar fashion.  I (as Corporate Monitor) sent an immediate demand to maintain the status quo of the various diamonds and jewelry pieces.  Provident Jewelry ignored my initial demand email as well as my follow-up letter.  Therefore, I will be taking the necessary actions against that company.

### 3.  The Horses

As previously reported, I seized four jumping horses in connection with the Corporate Monitor Action and before the filing of this action whose care and management were funded by primarily EFDG (and thus investors) before my appointment.  I relocated the horses to a new facility, continued to care for them through the EFDG/NDIC bank account, marketed them for sale, and ultimately signed three purchase agreements to sell all four horses for a total of $175,500, the funds of which I have received and deposited in the EFDG/NDIC account (that account funded the care, maintenance, and appraisals for the horses).  I filed two motions to approve the horses' sales (one motion when two purchase agreements were signed, and one motion in a self-executing manner before the third and final purchase agreement (for the two remaining horses) was signed), which the Court promptly granted [DE 105-106, 135, 138, and 141].

### 4.  Argyle's Technology

I provided notice of the Appointment Order to certain vendors including Ideofuzion, a Pakistani company and the developer of Argyle's cryptocurrency technology, blockchain, and code.  I will be investigating and evaluating whether Argyle's cryptocurrency technology has any value, and if so, how much and how best to sell it.

**5.   The Receivership Entities' Bank Accounts**

The Receivership Entities maintained bank accounts at Bank of America.  Again, there were no funds in the Receivership Entities' accounts as of my appointment.

I have performed, and continue to perform, a preliminary review of the bank records. Aman drained the corporate accounts to ensure there was a zero balance at the time of my appointment as Corporate Monitor and had spent many years living a very lavish multi-million-dollar lifestyle.  It also appears that Aman transferred significant funds to others, including, but not limited to, the Seigels (through their company Relief Defendant H.S. Management Group LLC) and Relief Defendant Winners Church and its pastor/bishop (Relief Defendants, the Shipmans).  It appears that there were many transactions that I believe are subject to clawback, including in the months leading up to my appointment as Corporate Monitor and no different than the 90-day preference period afforded to trustees in bankruptcy cases.  Therefore, I have investigated and will continue to investigate potential targets for purposes of ancillary receivership litigation.

In addition to Bank of America, I learned that the Receivership Entities may have had prior accounts at BB&T Bank and PNC Bank.  Like Bank of America, I served BB&T and PNC Banks with the Corporate Monitor Appointment Order and instructed them to freeze the company accounts.  Although there were no accounts or funds identified in the accounts at BB&T and/or PNC Banks, BB&T Bank froze $1,350.51 in the name of related entity (Fancy Diamonds Private Investments LLC.)  At my request, BB&T agreed to transfer the funds, which I received.

**6.   The Office Items**

As previously reported, I removed the remaining office items/personalty from the former business premises and have sold the various office items for $2,555.00.

In addition, there were 44 coins in one of the safes at the former business premises that I have secured. I intend to determine who owns the coins and ultimately whether they are subject to this proceeding. The coins are not part of any motion previously filed.

### 7. Diamonds Owned by Investors and Other Seigel Clients

After my appointment as Receiver, I learned the names of several people, including investors and Seigel clients, who have asked me whether I have secured their diamonds. It appears that several diamonds purportedly owned by several investors or Seigel clients are currently being held by G7. It also appears that certain non-parties, such as the above-mentioned American Institute of Diamond Cutting and the landlord, were each holding at least one diamond purportedly owned by investors/Seigel clients. Those specific diamonds have been turned over to me by the American Institute of Diamond Cutting and the landlord.

I have also communicated with several people who have represented to me that (i) they had purchased diamonds from the Seigels/their companies and (ii) thereafter the Seigels stored the diamonds in their safe, typically for purposes of a future auction or resale. Those investors/customers have asked me whether I have secured their diamonds. I have GIA reports of the cut/polished diamonds that I have secured and have the ability to check my inventory if the investor/customer provides the GIA number of his/her diamond. I have identified several diamonds that I have secured in that manner. For the diamonds that I do not have, I have asked the Seigels to account for the location of each diamond that is the subject of the investor/customer's inquiry. That process is ongoing, and I will continue to report on same in the future. I have also instructed investors in my most recent investor letter dated January 16, 2020, to please review the Exhibits to my First Report online, which show the diamonds held by me and G7, and to please contact me as soon as possible if they believe their diamonds are being held by me or G7.

### 8. The Colorado Property

Regarding the Seigel property in Colorado, the SEC and I continue our analysis of this sizeable asset. I will keep the victims updated regarding the ultimate disposition of this asset.

### E. A Description of Liquidated and Unliquidated Claims Held by the Receivership Estate, Including the Need for Forensic and/or Investigatory Resources; Approximate Valuations of Claims; and Anticipated or Proposed Methods of Enforcing Such Claims (Including Likelihood of Success in: (i) Reducing the Claims to Judgment; and, (ii) Collecting Such Judgments)

I have begun the process of investigating potential litigation targets who either improperly received transfers directly or indirectly from the Receivership Entities and/or damaged the Receivership Entities (and ultimately the investors) due to their actions and/or inactions. As previously reported, whatever claims that I ultimately bring will be with the hopes, and a probability, of winning and collecting. I remain very mindful and sensitive of the issue of expenses and the necessity for efficiency and limiting expenses as much as possible in every aspect of this proceeding, including investigating and filing ancillary lawsuits for additional recoveries to benefit the Receivership Estate. I intend to continue to make every decision with a cost-benefit analysis of the amount needed to bring and prosecute the claim versus the potential recovery.

Regarding the issue of forensic investigations, I have received many of the companies' bank records from Bank of America for the period of 2014 through 2019. As stated above, there were no funds in the accounts as of my appointment. The dissipation and transfers occurred over many years. There are literally thousands of transactions to reconstruct, including those that are legitimate and many that are undoubtedly illegitimate. Assuming there are sufficient funds to perform the necessary forensic work, I anticipate retaining an accounting firm to reconstruct the Receivership Entities' bank accounts and other relevant accounts.

I intend to determine what each investor is owed (net investment amount of money in and money out), as well as everyone who improperly received funds or otherwise profited from the

Receivership Entities' investment scheme.  I anticipate there will be many people and many entities who profited or improperly received funds.  I have already identified several.

In the coming days, I intend to serve initial pre-suit demand letters on identified targets, which may result in settlements[6] or alternatively ancillary lawsuits.  I anticipate that demand letters will continue for the next several months to later this year.  I will continue to not identify any targets in this Report.

### F. A List of All Known Creditors with Their Addresses and the Amounts of Their Claims

It appears that the Receivership Entities had hundreds of investors.  It also appears that the Receivership Entities raised at least $30 million.  I am still in the process of calculating the actual amount of money raised.   The amount of the investors'/creditors' claims, as well as my recommended treatment of such, will be part of the future claims procedure and claims proceedings (see section G, *infra*).

When the Corporate Monitor Action began, I (as Corporate Monitor) obtained investor lists from Aman.  However, the lists do not include what each investor has been repaid and do not include all of the investors' names.  I have been, and will continue to be, in constant contact with the investors.  I will also be compiling my own investor list, including names and contact information, to ensure I know the universe of investors, the amounts they invested, and the amounts they received back, whether denominated as "interest" or "principal."

Regarding the receivership website (naturaldiamondsreceivership.com), I continue to update it with important court filings and investor letters.  The receivership website also contains a registration form,[7] a "frequently asked questions" section to educate the investors about the

---

[6]  Settlements would be subject to Court-approval.

[7]  The registration form is a helpful tool for investors and creditors to send me their name, contact information, and an estimate of the amount of money they believe they are owed.

receivership process, and an email address (naturaldiamondsreceivership@lklsg.com) and phone number (786.347.2563), so the investors may contact me directly with questions that were not answered by the website.  My staff, professionals, and I regularly communicate with investors.

### G. The Status of Creditor Claims Proceedings, after Such Proceedings Have Been Commenced

It is still premature to discuss the specifics of a claims procedure and claims proceedings, or when exactly the claims procedure and claims proceedings will begin and conclude.  However, I anticipate developing a claims procedure later this year and concluding all claims proceedings as soon as possible with as little claims litigation as possible and ultimately repay all legitimate investor and creditor claims as soon as possible.

### H. The Receiver's Recommendations for a Continuation or Discontinuation of the Receivership and the Reason for the Recommendations

It is still my recommendation that the Receivership should continue for the benefit of the many victimized investors, who are collectively owed tens of millions of dollars.  The underlying investment scheme has all the ingredients of a massive Ponzi scheme affecting many victims in this Country and Canada.

My overall investigation will be ongoing for some period of time.  I will supplement this Fourth Report with my Fifth Report at the conclusion of the next quarter.


/s/ Jeffrey C. Schneider
Jeffrey C. Schneider, not individually,
but solely in my capacity as Receiver


Dated: April 30, 2020

# EXHIBIT A

STANDARDIZED FUND ACCOUNTING REPORT FOR
SECURITIES AND EXCHANGE COMMISSION
vs.
NATURAL DIAMONDS INVESTMENT CO., et al.
CASE NO.: 19-CV-80633-ROSENBERG
For the period January 1, 2020 through March 31, 2020

| Fund Accounting | | | | Detail | Subtotal |
|---|---|---|---|---|---|
| Line 1 | | | | NDIC Checking (Acct 7414)  (Corporate Monitor Account ) | |
| | | | | | $54,200.70 |
| | | | | SEC v. Argyle Checking (Acct 8373) | $20,546.00 |
| | | | | | |
| **TOTAL CURRENT ASSETS** | | | | | **$74,746.70** |
| | | 3/18/2020 | | Turn over of funds by Steptoe & Johnson LLP | |
| Line 2 | Business  Income | | | | $11,558.50 |
| | | 3/19/2020 | | Turn over of funds by Lexcuity, P.C. | |
| | | | | | $8,987.50 |
| **TOTAL INCOME** | | | | | **$20,546.00** |
| Line 3 | Cash and Securities | | | | $0.00 |
| **TOTAL CHECKING** | | | | | **$74,746.70** |
| Line 4 | Interest/Dividend Income | | | | $0.00 |
| **TOTAL INTEREST/ DIVIDEND INCOME** | | | | | |
| | Business Asset Liquidation | | | | $0.00 |
| | Personal Asset Liquidation | | | | $0.00 |
| Line 5 | Third-Party Litigation Income | | | | $0.00 |
| Line 6 | Miscellaneous - Other | | | | $0.00 |
| Line 7 | **TOTAL FUNDS (Lines 1-7)** | | | | **$74,746.70** |

| | | | | |
|---|---|---|---|---|
| Line 8 | **Decreases in Fund Balance:** RECEIVERSHIP EXPENSES | | | |
| | | | | |
| | | | | |
| | **TOTAL BUSINESS EXPENSES (Line 8)** | | | $0.00 |
| | Disbursements to Investors | | | $0.00 |
| | Disbursements to Receivership Operations | | | $0.00 |
| Line 9 | | | | |
| Line 10b | | | | |
| | Personal Asset Expenses | | | $0.00 |
| | Investment Expenses | | | $0.00 |
| Line 10c | Third-Party Litigation Expenses 1. Attorneys Fees | | | $0.00 |
| Line 10d | 2. Litigation Expenses | | | $0.00 |
| Line 10e | Tax Administrator Fees and Bonds | | | $0.00 |
| Total Third-Party Litigation Expenses | Federal and State Tax Payments | | | $0.00 |
| Line 10f | **TOTAL DISBURSEMENTS FOR RECEIVERSHIP OPERATIONS** | | | $0.00 |
| Line 10g | Disbursements for Distribution Expenses Paid by the Fund: | | | $0.00 |
| | Distribution Plan Development Expenses | | | $0.00 |
| Line 11 | Fees: | | | $0.00 |

| | | | | |
|---|---|---|---|---|
| Line 11a | Fund Administrator | | | $0.00 |
| | Independent Distribution Consultant (IDC) | | | $0.00 |
| | Distribution Agent | | | $0.00 |
| | Consultants | | | $0.00 |
| | Legal Advisers | | | $0.00 |
| | Tax Advisers | | | $0.00 |
| | 2. Administrative Expenses | | | $0.00 |
| | 3. Miscellaneous | | | $0.00 |
| | Total Plan Development Expenses | | | $0.00 |
| | Distribution Plan Development Expenses | | | $0.00 |
| | 1. Fees: | | | $0.00 |
| Line 11b | Fund Administrator | | | $0.00 |
| | Independent Distribution Consultant (IDC) | | | $0.00 |
| | Distribution Agent | | | $0.00 |
| | Consultants | | | $0.00 |
| | Legal Advisers | | | $0.00 |
| | Tax Advisers | | | $0.00 |
| | 2. Administrative  Expenses | | | $0.00 |
| | 3. Investor Identification: | | | $0.00 |
| | Notice/Publishing Approved Plan | | | $0.00 |
| | Claimant Identification | | | $0.00 |
| | Claims Processing | | | $0.00 |
| | Web Site Maintenance | | | $0.00 |
| | 4. Fund Administrator Bond | | | $0.00 |
| | 5. Miscellaneous | | | $0.00 |
| | 6. Federal Account for Investor Restitution (FAIR) Reporting Expenses | | | $0.00 |
| | *Total Plan Implentation Expenses* | | | $0.00 |
| | Total Disbursements for Distribution Expenses Paid by the Fund | | | $0.00 |
| | Disbursements to Court/Other | | | $0.00 |
| | Investment Expenses/Court Registry Investment System (CRIS) Fees | | | $0.00 |
| Line 12 | Federal Tax Payments | | | $0.00 |
| Line 12a | Total Disbursements to Court/Other: | | | $0.00 |
| Line 12b | TOTAL FUNDS DISBURSED (Lines 8-11) | | | $0.00 |
| | Cash & Cash Equivalents | | | $0.00 |
| | Investments | | | $0.00 |
| Line 13 | Other Assets or Uncleared Funds | | | $0.00 |
| Line 14 | TOTAL ENDING BALANCE (AS OF 3/31/20) | | | $74,746.70 |

| | | | | |
|---|---|---|---|---|
| Line 14a | | | | |
| Line 14b | *Report of Items NOT to be Paid by the Fund:* | | | |
| Line 14c | **Disbursements for Plan Administration Expenses Not Paid by the Fund:** | | | $0.00 |
| | *Plan Development Expenses Not Paid by the Fund:* | | | $0.00 |
| OTHER SUPPLEMENTAL INFORMATION: | **1. Fees:** | | | $0.00 |
| | Fund Administrator | | | $0.00 |
| Line 15 | IDC | | | $0.00 |
| Line 15a | Distribution Agent | | | $0.00 |
| | Consultants | | | $0.00 |
| | Legal Advisers | | | $0.00 |
| | Tax Advisers | | | $0.00 |
| | **2. Administrative Expenses** | | | $0.00 |
| | **3. Miscellaneous** | | | $0.00 |
| | **Total Plan Development Expenses Not Paid by the Fund** | | | $0.00 |
| | *Plan Implentation Expenses Not Paid by the Fund:* | | | $0.00 |
| | **1. Fees:** | | | $0.00 |
| | Fund Administrator | | | $0.00 |
| | IDC | | | $0.00 |
| Line 15b | Distribution Agent | | | $0.00 |
| | Consultants | | | $0.00 |
| | Legal Advisers | | | $0.00 |
| | **2. Administrative Expenses** | | | $0.00 |
| | **3. Investor Identification:** | | | $0.00 |
| | Notice/Publishing  Approved Plan | | | $0.00 |
| | Claimant Identification | | | $0.00 |
| | Claims Processing | | | $0.00 |
| | Web Site Maintenance | | | $0.00 |
| | **4. Fund Administrator Bond** | | | $0.00 |
| | **5. Miscellaneous** | | | $0.00 |
| | **6. FAIR Reporting Expenses** | | | $0.00 |
| | *Tax Administrator Fees & Bonds Not Paid by the Fund* | | | |
| | **Total Disbursements for Plan Administration Expenses Not Paid by the Fund** | | | $0.00 |
| | **Disbursements to Court/Other Not Paid by the Fund:** | | | $0.00 |
| Total Plan Implementation Expenses Not paid by the Fund | Investment Expenses/CRIS Fees | | | $0.00 |
| Line 15c | Federal Tax Payments | | | $0.00 |
| | **Total Disbursements to Court/Other Not Paid by the Fund:** | | | $0.00 |

| Line 16 | DC & State Tax Payments | | | $0.00 |
|---|---|---|---|---|
| Line 16a | **No. of Claims:** | | | 0 |
| Line 16b | # of Claims Received this Reporting Period | | | |
| | # of Claims Received Since Inception of Fund | | | |
| Line 17 | **No. of Claimants/Investors:** | | | |
| Line 18 | # of Claimants/Investors Paid this Reporting Period | 0 | | $0.00 |
| Line 18a | # of Claimants/Investors Paid Since Inception of Fund | 0 | | $0.00 |
| Line 18b | | | | |
| Line 19 | | | | |
| Line 19a | | | | |
| Line 19b | | | | |
| By: | | | | |
| | Jeffrey Schneider, Court-Appointed Receiver | | | |
| Printed Name | | | | |
| Date: April 30, 2020 | | | | |

# EXHIBIT B

# Jewelry by Frank Inc. Appraisal Service

### 5670 West Atlantic Ave # 101  Delray Beach, Florida 33484

# Appraisal

**Customer:** Securities And Exchange Commission vs. Natural Diamonds Investment Co., st al. Case No. 9:19-cv-80633-Rosenberg
February 27, 2020
**Page Number: 2 of 78**

**Address:** Report Prepared For: Jeffrey C, Schneider,
Court-Appointed Receiver.

### Multi-Item Summary  No. 9355-2009

**Jewelry:** Rough Diamond

**Description:** One loose rough cut diamond with a weight a weight of 19.33 ct. Color dark yellowish green, clarity I2.

**Diamond(s):** **Shape:** Rough
**Quantity:** 1, Unmounted
**ActualWeight:** 19.33 carat
**Dimensions:** Length- 15.3 mm. ; Width- 15.0 mm. ; Depth- 10.22 mm.
**Depth Percentage:** 68.1%
**Girdle:** Not Visible
**Clarity:** I2
**Color:** Z, Green

**Replacement Value:** $9,993.00

**Instruments used in evaluation:** All applicable instruments

**Appraisal last updated on:** February 24, 2020

 

*The appraiser assumes no liability regarding any action taken on the basis of this Appraisal.*

# *Jewelry by Frank Inc. Appraisal Service*

### *5670 West Atlantic Ave # 101  Delray Beach, Florida 33484*

## Multi-Item Summary  No. 9355-2009

**February 27, 2020**
**Page Number: 3 of 78**



---

## Multi-Item Summary  No. 9356-2009

**Jewelry:** Rough Diamond

**Description:** One loose rough cut octahedral diamond with a weight of 6.38 ct. Color is light brown to yellowish brown, possible very faint pink. Clarity vs.

**Diamond(s):**
**Shape:** Rough
**Quantity:** 1, Unmounted
**ActualWeight:** 6.38 carat
**Dimensions:** Length- 8.81 mm. ; Width- 8.50 mm. ; Depth- 7.89 mm.
**Depth Percentage:** 92.8%
**Girdle:** Not Visible
**Clarity:** VS1-VS2
**Color:** Z, Yellowish brown to faint pink

**Replacement Value:**

**Instruments used in evaluation:** All applicable instruments

**Appraisal last updated on:** February 24, 2020

*The appraiser assumes no liability regarding any action taken on the basis of this Appraisal.*