UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Palm Beach Division)

Case No. 9:19-CV-80633-ROSENBERG

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

NATURAL DIAMONDS INVESTMENT CO.,
et al.,

    Defendants,

H.S. MANAGEMENT GROUP LLC, et al.,

    Relief Defendants.
_____/

## NINTH QUARTERLY STATUS REPORT OF RECEIVER JEFFREY C. SCHNEIDER

Pursuant to paragraphs 46 and 47 of Section XII of the Order Granting Plaintiff Securities and Exchange Commission's Motion for Appointment of Receiver [DE 20] (the "Appointment Order"), Jeffrey C. Schneider, not individually, but solely in his capacity as the Court-appointed Receiver (the "Receiver") for Natural Diamonds Investment Co. ("NDIC"), Eagle Financial Diamond Group, Inc. ("EFDG"), and Argyle Coin, LLC ("Argyle") (collectively, the "Receivership Entities"), submits his Ninth Quarterly Status Report for the quarter ending June 30, 2021.

### INTRODUCTION

I have filed a number of reports and I will try not to be repetitive in this one. Since the filing of my last report, there have been three significant developments, all of which are discussed in more detail in this Report. First, I have reached a settlement resulting in $750,000.00 for the receivership estate. Second, the process of making payments to holders of allowed claims has

begun. Proof of claim forms have been approved by the Court and sent to all known investors and non-investor creditors. Finally, I have decided that it is time to sell the pieces in my possession. I had waited for some time given the COVID crisis, but I now think it is time to sell the pieces rather than continuing to wait.

The Appointment Order requires me to file Quarterly Status Reports within 30 days of the end of each calendar quarter. This report will cover the period from April 1 through June 30, 2021, including the three main areas summarized above.

Pursuant to paragraph 47 of the Appointment Order, the topics herein include:

A. A summary of my operations;

B. The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C. A schedule of all the receipts and disbursements (attached as Exhibit A to the Quarterly Status Report) of the receivership, with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D. An update about all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E. An update about description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F. An update about known creditors with their addresses and the amounts of their claims;

G. The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

H. My recommendations for a continuation or discontinuation of the receivership and the reason for the recommendations.

Case No. 9:19-CV-80633-ROSENBERG

I will continue to address these topics one-by-one below.

**A. A Summary of the Operations of the Receiver**

    **1. Procedural Background in This Proceeding**

On May 13, 2019, the Securities and Exchange Commission (the "SEC") filed an emergency action in this Court to enjoin NDIC, EFDG (a/k/a Diamante Atelier), and Argyle (again, the "Receivership Entities"), and their owners, Jose Aman, Harold Seigel and Jonathan Seigel. In the Complaint [DE 1], the SEC asserted various claims against the Receivership Entities, Aman, and the Seigels. Essentially, the SEC alleged that the Receivership Entities were a three-tiered Ponzi scheme that promised hundreds of investors unreasonably large investment returns that ranged from 24% to 100% every year to two years for signing investment contracts that were supposedly backed by diamonds worth tens of millions of dollars. The SEC alleged that the Receivership Entities raised approximately $30 million from approximately 300 investors in Canada and the United States from late 2013 through the present.

The SEC also filed a Motion for Temporary Restraining Order, Asset Freeze, and Other Relief [DE 4] and a Motion for Appointment of Receiver [DE 7]. This Court granted the SEC's requests and, among other things, appointed me as Receiver for Argyle and then later expanded the receivership to include NDIC and EFDG. I thereafter assumed full control of Argyle, NDIC and EFDG to secure, conserve, hold, manage, and prevent the loss of their assets.

To the extent possible, I will endeavor not to restate information provided in prior reports and will instead focus on operations and accomplishments during the last quarter.

As previously reported, a settlement was reached at mediation between the SEC, G7, and me, which was approved by the Court [DE 257 and DE 252-1]. As previously reported, I have obtained possession of the 53 pieces from G7 pursuant to the settlements, some of which we have now determined to be owned by others, but the remainder of which will be sold at auction.

However, because more of those diamonds have been determined to be owned by others, G7 and I have entered into an addendum to slightly modify the sale procedure for the remaining diamonds (*i.e.*, the non-investor owned diamonds), which has been submitted to this Court for approval.

Since my appointment, my professionals and I have been working to effectuate my obligations under the Appointment Order. As discussed more fully below, this work has primarily involved identifying and securing assets of the Receivership Entities, as well as preserving the Receivership Entities' books and records (hard copy and electronic). Throughout this process, my professionals and I have continued to work cooperatively with the SEC and other agencies, with each side mindful of their respective responsibilities and duties.

**2. Communications with the Seigels**

As discussed in prior reports, Harold Seigel and his entity, H.S. Management Group, have been Court-ordered to respond to certain questions that I posed to them and to produce certain documents I had requested. In my view, Harold Seigel and H.S. Management Group have not yet answered under oath all of the written questions I asked and have not provided all of the documents requested, so we continue to pursue that information.

**3. The Business**

As previously reported, there is no operating business for the Receivership Entities. All company bank accounts were depleted and closed by the time of my appointment. The Receivership Entities' websites remain shut down. I continue to maintain hard copy files of dozens of boxes of documents and the corporate computer's CPU from the former business premises.

**4. Demands**

As previously reported, I discovered that a former professional of NDIC and EFDG testified that he knew they operated as a Ponzi scheme. This particular professional has a $1 million insurance policy. As a result, I made a demand on this professional for the entire insurance

policy to be tendered, and after extended negotiations with that professional, during the prior quarter, we reached a six-figure agreement that has since been approved by this Court. On July 6, 2021, I moved to approve the $750,000 settlement with the accounting firm that assisted the Receivership Entities pre-receivership [DE 297] and the Court promptly granted that motion [DE 298] on July 9, 2021. The settlement payment will be made when that order becomes final.

### 5. Other Pending Lawsuits

There have been many pending lawsuits against the Receivership Entities, the Seigels, and/or Aman. I continue to communicate with the lawyers and presiding judges in the known pending cases to confirm that the various courts are observing the stay of those other lawsuits. Importantly, the Appointment Order in Section VII, paragraphs 27-29, prohibits anyone from suing the Receivership Entities or executing on their assets. All known pending claims against the Receivership Entities in the other lawsuits should be or remain stayed, although the claims against Aman and/or the Seigels in several lawsuits remain pending. I also continue to reserve all rights to bring the stay issue before this Court, if necessary. Several of the pending lawsuits have required recent action by me, as the Courts have issued notices of lack of prosecution (and some have been previously dismissed for lack of prosecution) or status checks, because the cases have been dormant because of the stay, so I have worked with investor counsel to confirm that the stay remains in place in those cases.

### 6. Receivership Appraiser

As previously reported, I retained a diamond/jewelry appraiser named Jewelry by Frank Inc. Appraisal Service (principal Frank Graziano) (the "Appraiser" or "Jewelry by Frank"). The Appraiser is familiar with the diamonds in the receivership because Mr. Graziano previously appraised a large amount of the inventory of the diamonds of the Receivership Entities before my appointment. That prior experience and familiarity with the diamonds benefitted the Estate,

including by saving expenses associated with appraising the many diamonds I secured. As also previously reported, the Appraiser has now concluded appraisals of all diamonds and other jewelry pieces we obtained through takeover and our prior demands for return of receivership property.

7. **Receivership CPA**

Pursuant to para. 50 of Section XIII of the Appointment Order, I retained, and this Court promptly approved the retention of, the accountants at the accounting firm Kaufman & Company P.A. [DE 202, 210]. Dana M. Kaufman, J.D., CPA, CVA, CFE, is the principal shareholder of the firm and has primary responsibility for this matter. Mr. Kaufman and his firm assisted in filing the tax returns for prior years and is assisting me in challenging penalties assessed by the IRS for filing the returns for pre-receivership years late.

8. **Marketing Plan**

I continue to have discussions with local and well-known auctioneers about planning for, and conducting, an auction for the pieces that I have secured. I had previously waited to conduct the auction for two reasons. First, the ongoing pandemic has certainly impacted the sales price of the various pieces that I am holding. If a short delay results in significantly increased prices, it is worth it; if the delay becomes too long, then I will rethink the decision, of course. Second, now that the claims procedure is ongoing, I want to confirm that there are no other diamonds owned by others to be included in what is being sold. Final decisions about the structure of the auction will be reached in the next quarter and will be included in my next report.

B. **The Amount of Cash on Hand, the Amount and Nature of Accrued Administrative Expenses and the Amount of Unencumbered Funds in the Estate**

As of June 30, 2021, there was $1,546,483.75 in the Argyle receivership bank account. The Argyle receivership account was previously funded with the approximate $2 million in

settlement monies from Relief Defendants Winners Church/the Shipmans.[1]  The Argyle receivership account will be further funded once the $750,000 settlement payment is received and the auction is completed.

As previously reported, I established an NDIC and EFDG receivership bank account in early April 2019 to deposit and safeguard their funds in connection with the Corporate Monitor Action (as defined in prior reports) that was closed.  As of June 30, 2021, there was $46,575.70 in that account.

### C. A Schedule of All the Receiver's Receipts and Disbursements (Attached as Exhibit A to the Quarterly Status Report), with One Column for the Quarterly Period Covered and a Second Column for the Entire Duration of the Receivership

Attached as **Exhibit A** is the required schedule of my receipts and disbursements during the subject quarterly period.  The attached schedule reflects the balances delineated above for the Argyle and EFDG/NDIC receivership accounts, respectively.

### D. A Description of All Known Receivership Property, Including Approximate or Actual Valuations, Anticipated or Proposed Dispositions, and Reasons for Retaining Assets Where No Disposition Is Intended

**1. The Funds Deposited into the Court's Registry**

As previously reported, the SEC settled with Winners Church and the Shipmans and Final Judgments were entered against them [DE 164, 166].

On December 20, 2019 (docketed on December 23, 2019), Winners Church and the Shipmans deposited various funds totaling $1,444,221.58 into the Court's registry [DE 170-174]. On January 2, 2020 (docketed on January 3, 2020), Frederick Shipman deposited an additional $229,372.06 [DE 177].  On July 16, 2020, Frederick Shipman deposited an additional $287,799.07

---

[1] The current amount in the account is less than $2 million because my professionals and I have been paid our collective fees and reimbursed our collective expenses from several separate Court-approved fee applications that had been outstanding, and thus unpaid, from the start of this case for more than 18 months.

[DE 222-223]. On February 17, 2021, the Clerk docketed that Frederick Shipman had deposited an additional $43,486 on April 16, 2020 [DE 283]. Thus, a total of $2,004,878.71 was deposited which was transferred to me under the procedure set forth in the Final Judgments against those parties [DE 280, 282, 285, 286].

### 2. The Diamonds

Shortly after my appointment, I learned that several people and companies were holding diamonds owned by EFDG/NDIC and/or swept into the underlying EFDG/NDIC scheme. I discuss what I received, from whom, and the current the disposition of those assets below.

#### a. Aman

As previously reported, I obtained 104 pouches of uncut, unpolished colored diamonds from Aman shortly after I was appointed. The inventory of the 104 pouches of rough diamonds was attached as Exhibit B to my First Report. I also obtained Aman's fiancée's engagement ring. All of these items have been appraised, are located in my safe deposit box, and are approved for sale to third parties. As noted above, I am in the process of finalizing the plan for an auction of the vast majority of those diamonds that have not been separately determined to be owned by others.

#### b. Harold Seigel

As previously reported, Harold Seigel was holding two cut yellow diamonds of 1.27 and 2.37 carats, which he later turned over to me upon my demand. They will not be included in the forthcoming auction, because I learned that these two diamonds are actually owned by an individual and are not owned by the Receivership Entities, nor were they invested with any of the Receivership Entities. Pursuant to the Court's Order determining the ownership of these two diamonds and others (discussed below), [DE 271], these items will be returned to their owners,

conditioned upon the owners compensating the Receivership Estate their pro rata portion of my recovery efforts.

c. **Investors**

Certain investors had been holding diamonds and/or jewelry owned by EFDG/NDIC. Aman gave such items to certain investors to hold as a sign of good faith for making future payments under the investment contracts. I made numerous demands for turnover, and one investor returned the diamonds/jewelry; however, others ignored my demand or informed me that they have already sold the pieces prior to my appointment.

These diamonds are also located in my safe deposit box, have been inventoried and appraised, and will be sold through the forthcoming auction.

d. **Vendors**

Like investors, vendors such as the landlord for the Receivership Entities' business premises, 125 Worth Partners LLC, had been holding diamonds owned by EFDG/NDIC. Upon my demand for turnover, the landlord complied and turned over five diamonds to me. The diamonds are located in my safe deposit box and have been inventoried. The acknowledgement of receipt/list was attached as Exhibit F to my First Report.

During my investigation, I learned that one of the landlord diamonds is actually owned by an individual and is not owned by the Receivership Entities, nor was it invested with any of the Receivership Entities. The individual who owns the diamond has also provided to me satisfactory proof of ownership, thus, pursuant to the Court's ownership order referenced above [DE 271], I will be returning that diamond to its rightful owner, conditioned upon the owner compensating the Receivership Estate the pro rata portion of my recovery efforts.

Other vendors, like American Institute of Diamond Cutting, Inc. ("AIDC") also had diamonds from EFDG/NDIC. Upon my demand for the turnover of diamonds in its possession,

AIDC complied and turned over three diamonds to me. Two of those diamonds have been determined to be owned by others and will be returned to their rightful owners, in the manner discussed above. The other will be sold as part of the forthcoming auction.

### e. Non-Party Carmelo De Stefano

I learned that non-party Carmelo De Stefano likely had many diamonds or pieces of jewelry that derived from the Receivership Entities. As reported earlier, upon my demand, ultimately I obtained possession of 38 pieces of jewelry and diamonds from Mr. De Stefano pursuant to an Agreed Order [DE 73]. As with the others, my plan is to sell these diamonds through the forthcoming auction.

### f. Local Diamond Stores

Shortly after my appointment as Corporate Monitor, Aman disclosed to me that there were two local jewelry stores, G7 and Provident, that had recently received valuable diamonds owned by EFDG/NDIC. The status of the settlement with G7 regarding the diamonds it received was already discussed above. Like G7, Provident Jewelry, namely the 331 Clematis Street store, received some diamonds in a similar fashion. I (as Corporate Monitor) sent an immediate demand to maintain the status quo of the various diamonds and jewelry pieces. Provident Jewelry ignored my demand and my follow-up letter. I have consulted with the SEC about future actions against this company.

### 3. The Horses

As previously reported, I seized four jumping horses in connection with the Corporate Monitor Action and before the filing of this action whose care and management were funded by primarily EFDG (and thus investors) before my appointment. As previously reported, the horses were ultimately sold and the proceeds were deposited into the EFDG/NDIC bank account.

### 4. Argyle's Technology

I provided notice of the Appointment Order to certain vendors including Ideofuzion, a Pakistani company and the developer of Argyle's cryptocurrency technology, blockchain, and code.  I continue my evaluation as to whether Argyle's cryptocurrency technology has any value, and if so, how much and how best to sell it.

### 5. The Receivership Entities' Bank Accounts

The Receivership Entities maintained bank accounts at Bank of America and had previously banked at other institutions.  Again, there were no funds in the Receivership Entities' accounts as of my appointment, but one institution, BB&T, froze $1,350.51 in the name of related entity (Fancy Diamonds Private Investments LLC), and it agreed to transfer the funds to me.

### 6. The Office Items

As previously reported, I removed the remaining office items/personalty from the former business premises and have sold the various office items for $2,555.00.

In addition, there were 44 coins in one of the safes at the former business premises that I have secured.  I intend to determine who owns the coins and ultimately whether they are subject to this proceeding.  The coins are not part of any motion previously filed.

### 7. Diamonds Owned by Investors and Other Seigel Clients

After my appointment as Receiver, I learned the names of several people, including investors and Seigel clients, who asked me whether I have secured their diamonds.  It appears that at least 14 identified diamonds owned by several investors or Seigel clients were held by G7, AIDC, EFDG's landlord, and Seigel.  Those 14 diamonds are in my possession and, as stated above, I have been authorized to return the diamonds to their rightful owners (except the Seigel diamond) pending them repaying the Receivership Estate their pro rata share of my recovery efforts.  I am in ongoing communication with these owners about the return of their diamonds,

and I am currently researching the claims of other individuals as to whether the receivership has possession of their diamonds.

### 8. The Colorado Property and Related Seigel Accounting Issues

I am aware of the property in Colorado owned by Harold Seigel's wife. I will keep the victims updated regarding the ultimate disposition of this asset. As noted above, I continue to seek the Court-ordered information from the Seigels regarding any monies that might have been used for this home.

### E. A Description of Liquidated and Unliquidated Claims Held by the Receivership Estate, Including the Need for Forensic and/or Investigatory Resources; Approximate Valuations of Claims; and Anticipated or Proposed Methods of Enforcing Such Claims (Including Likelihood of Success in: (i) Reducing the Claims to Judgment; and (ii) Collecting Such Judgments)

I continue the process of investigating potential litigation targets who either improperly received transfers directly or indirectly from the Receivership Entities and/or damaged the Receivership Entities (and ultimately the investors) due to their actions and/or inactions. As previously reported, whatever claims that I ultimately bring will be with the hopes, and a probability, of winning and collecting. Also, whatever claims that I ultimately bring must be fully vetted with and ultimately approved by the SEC. I remain very mindful and sensitive of the issue of expenses and the necessity for efficiency and limiting expenses as much as possible in every aspect of this proceeding, including investigating potential ancillary lawsuits for additional recoveries to benefit the Receivership Estate. I intend to continue to make every decision with a cost-benefit analysis of the amount needed to bring and prosecute the claim versus the potential recovery. At this time, with the conclusion of the settlement with the pre-receivership accountant, there is no other pending claim to be brought by the Receiver.

Regarding the issue of forensic investigations, the SEC has previously provided me with their forensic reconstruction regarding solely investor transactions, upon which I will rely as I

administer the claims procedure. Mr. Kaufman and his firm have also been instrumental in cataloging various transactions found in the banking records.

### F. A List of All Known Creditors with Their Addresses and the Amounts of Their Claims

It appears that the Receivership Entities had hundreds of investors. It also appears that the Receivership Entities raised at least $30 million. I have compiled my own investor list, including names and contact information, to ensure I know the universe of investors, which I used to send out claims forms for the recently begun claims procedure (*see* section G, *infra*).

I continue to update the receivership website (naturaldiamondsreceivership.com) with court filings and information for investors. The receivership website also contains a link to the claim form, a "frequently asked questions" section to educate the investors about the receivership process, and an email address (naturaldiamondsreceivership@lklsg.com) and phone number (786.347.2563), so the investors may contact me directly. My staff, professionals, and I regularly communicate with investors.

### G. The Status of Creditor Claims Proceedings, after Such Proceedings Have Been Commenced

During the subject quarter, I moved to establish a claims procedure, which the Court granted [DE 293, 296]. The Court has approved a process by which we will be assessing claims on a "net loss" basis, which is also known as the "net in-net out" basis. Because the Receivership Entities operated as a Ponzi scheme, it is important to remember that there was no meaningful source of income generation, so there is no money to pay promised returns to investors. Instead, the Court has approved a process that will only be recognizing the "net" amount of money investors or creditors are owed from the Receivership Entities, which is computed by subtracting any amounts that they received from the Receivership Entities – regardless of whether they received those amounts as interest or principal – from any amounts they sent to the Receivership Entities.

Stated differently, claim amounts will be based on money investors sent to the Receivership Entities less money or property they received back from the Receivership Entities.

I sent via U.S. Mail to known potential claimants a letter dated June 25, 2021, enclosing the receivership claim form. I also sent an email with the letter and claim form to as many claimants for whom I had email addresses, although not required under the approval order. The letter and claim form are also posted on the receivership website. In the letter, I instructed potential claimants that if they believe they have suffered economic damages due to the activities of the Receivership Entities, they must complete and submit the proof of claim form to us by no later than September 30, 2021, in order to be considered eligible to receive distributions.

Finally, and as stated above, there are a few individuals that sent diamonds or other pieces of jewelry to the Receivership Entities for safekeeping, re-certification, or to be sold. I also sent the claim form to those individuals and requested that they provide us with as much information as they can about those pieces (including GIA numbers and any other descriptions) and the circumstances under which they were sent to the Receivership Entities.

My intention remains to conclude the claims proceeding as soon as possible with as little claims litigation as possible and ultimately repay as many legitimate investor and creditor claims with available receivership funds as soon as practicable.

### H. The Receiver's Recommendations for a Continuation or Discontinuation of the Receivership and the Reason for the Recommendations

It is still my recommendation that the receivership should continue for the benefit of the many victimized investors, who are collectively owed tens of millions of dollars. The underlying investment scheme has all the ingredients of a massive Ponzi scheme affecting many victims in this country and Canada.

My overall investigation will be ongoing for some period of time. I will supplement this Ninth Report with my Tenth Report at the conclusion of the next quarter.

Case No. 9:19-CV-80633-ROSENBERG

Dated: August 6, 2021

/s/ Jeffrey C. Schneider
Jeffrey C. Schneider, not individually,
but solely in my capacity as Receiver

# EXHIBIT A

**STANDARDIZED FUND ACCOUNTING REPORT**

**SECURITIES AND EXCHANGE COMMISSION**
**vs.**
**NATURAL DIAMONDS INVESTMENT CO., et al.**
**CASE NO.: 19-CV-80633-ROSENBERG**
Reporting Period April 1, 2021 through June 30, 2021

FUND ACCOUNTING

| | | | Detail | Subtotal |
|---|---|---|---|---|
| **Line 1** | Beginning Balance | | | $1,652,551.53 |
| **Line 2** | Business Income | | | $0.00 |
| **Line 3** | Cash and Securities | | | $0.00 |
| **Line 4** | Interest/Dividend Income | | | $0.00 |
| **Line 5** | Business Asset Liquidation | | | $0.00 |
| **Line 6** | Personal Asset Liquidation | | | $0.00 |
| **Line 7** | Third-Party Litigation Income | | | $0.00 |
| **Line 8** | Miscellaneous - Other | | | $0.00 |
| | **TOTAL FUNDS (Lines 1-8)** | | | **$1,652,551.53** |
| | **Decreases in Fund Balance:** | | | |
| **Line 9** | **Disbursements to Investors** | | | $0.00 |
| **Line 10** | **Disbursements for Receivership Operations** | | | $0.00 |
| Line 10a | Disbursements to Receiver or Other Professionals | | | $59,157.08 |
| Line 10b | Business Asset Expenses (Bank Service Charge) | | | $335.00 |
| Line 10c | Personal Asset Expenses | | | $0.00 |
| Line 10d | Investment Expenses | | | $0.00 |
| Line 10e | Third-Party Litigation Expenses | | | $0.00 |
| | Attorneys Fees | | | $0.00 |
| | Litigation Expenses | | | $0.00 |
| | **Total Third-Party Litigation Expenses** | | | $0.00 |
| | **Total Disbursements for Receivership Operations:** | | | **$59,492.08** |
| **Line 11** | **Disbursements for Distribution Expenses Paid by the Fund:** | | | |
| Line 11a | Distribution Plan Development Expenses: | | | |
| | Fees | | | $0.00 |
| | Fund Administrator | | | $0.00 |
| | Independent Distribution Consultant (IDC) | | | $0.00 |
| | Distribution Agent | | | $0.00 |
| | Consultants | | | $0.00 |
| | Legal Advisers | | | $0.00 |
| | Tax Advisers | | | $0.00 |
| | Administrative Expenses | | | $0.00 |
| | Miscellaneous - Other | | | $0.00 |
| | **Total Plan Development Expenses** | | | $0.00 |
| Line 11b | Distribution Plan Implmentation Expenses: | | | |
| | Fees | | | |
| | Fund Administrator | | | $0.00 |
| | Independent Distribution Consultant (IDC) | | | $0.00 |
| | Distribution Agent | | | $0.00 |
| | Consultants | | | $0.00 |
| | Legal Advisers | | | $0.00 |
| | Tax Advisers | | | $0.00 |

| | | | | |
|---|---|---|---|---|
| | Administrative Expenses | | | $0.00 |
| | Investor Identification | | | $0.00 |
| | Notice/Publishing Approved Plan | | | $0.00 |
| | Claimant Identification | | | $0.00 |
| | Claims Processing | | | $0.00 |
| | Website Maintenance/Call Center | | | $0.00 |
| | Fund Administrator Bond | | | $0.00 |
| | Miscellaneous - Other | | | $0.00 |
| | Federal Account for Investor Restitution (FAIR) Reporting Expenses | | | $0.00 |
| | **Total Plan Implementation Expenses Not Paid by the Fund** | | | $0.00 |
| | **Total Disbursements for Distribution Expenses Paid by the Fund** | | | $0.00 |
| **Line 12** | **Disbursements to Court/Other:** | | | |
| Line 12a | Investment Expenses/Court Registry Investment System (CRIS) Fees | | | $0.00 |
| Line 12b | Federal Tax Payments | | | $0.00 |
| | **Total Disbursements to Court/Other:** | | | $0.00 |
| | **Total Funds Disbursed (Lines 9-11):** | | | **$59,492.08** |
| **Line 13** | **Ending Balance (As of 6/30/2021):** | | | **1,593,059.45** |
| **Line 14** | **Ending Balance of Fund - Net Assets:** | | | |
| Line 14a | Cash & Cash Equivalents | | | $0.00 |
| Line 14b | Other Assets or Uncleared Funds | | | $0.00 |
| | **Total Ending Balance of Fund - Net Assets** | | | $0.00 |
| | | | | |
| **OTHER SUPPLEMENTAL INFORMATION:** | **Report of Items NOT to be Paid by the Fund:** | | | |
| **Line 15** | **Disbursements for Plan Adminisration Expenses Not Paid by the Fund:** | | | $0.00 |
| Line 15a | Fees | | | $0.00 |
| | Fund Administrator | | | $0.00 |
| | IDC | | | $0.00 |
| | Distribution Agent | | | $0.00 |
| | Consultants | | | $0.00 |
| | Legal Advisers | | | $0.00 |
| | Tax Advisers | | | $0.00 |
| | Administrative Expenses | | | $0.00 |
| | Miscellaneous | | | $0.00 |
| | **Total Plan Development Expenses Not Paid by the Fund** | | | $0.00 |
| Line 15b | **Plan Implementation Expenses Not Paid by the Fund:** | | | $0.00 |
| | Fees | | | |
| | Fund Administrator | | | $0.00 |
| | IDC | | | $0.00 |

| | | | | |
|---|---|---|---|---|
| | Distribution Agent | | | $0.00 |
| | Consultants | | | $0.00 |
| | Legal Advisers | | | $0.00 |
| | Tax Advisers | | | $0.00 |
| | Administrative Expenses | | | $0.00 |
| | Investor Identification: | | | $0.00 |
| | Notice/Publishing Approved Plan | | | $0.00 |
| | Claimant Identification | | | $0.00 |
| | Claims Processing | | | $0.00 |
| | Website Maintenance/Call Center | | | $0.00 |
| | Fund Administrator Bond | | | $0.00 |
| | Miscellaneous | | | $0.00 |
| | FAIR Reporting Expenses | | | $0.00 |
| | **Total Plan Implementation Expenses Not Paid by the Fund** | | | $0.00 |
| Line 15c | **Tax Administrator Fees & Bonds Not Paid by the Fund:** | | | |
| | **Total Disbursements for Plan Administration Expenses Not Paid by the Fund** | | | $0.00 |
| **Line 16** | **Disbursements to Court/Other Not Paid by the Fund:** | | | $0.00 |
| Line 16a | Investment Expenses/CRIS Fees | | | $0.00 |
| Line 16a | Federal Tax Payments | | | $0.00 |
| | **Total Disbursements to Court/Other Not Paid by the Fund:** | | | $0.00 |
| **Line 17** | **DC & State Tax Payments** | | | $0.00 |
| **Line 18** | **No. of Claims:** | | | |
| Line 18a | # of Claims Received This Reporting Period | | 0 | |
| Line 18b | # of Claims Received Since the Inception of Fund | | 0 | |
| **Line 19** | **No. of Claimants/investors:** | | 0 | |
| Line 19a | # of Claimants/Investors Paid This Reporting Period | | 0 | |
| Line 19b | # of Claimants/Investors Paid Since Inception of Fund | | 0 | |

Receiver:

By: _____
Jeffrey C. Schneider, Court Appointed Receiver

Jeffrey C. Schneider_____
(printed name)

Date:  August 6, 2021